Cathleen V. CRONIN, Plaintiff,

v.

**UNITED SERVICE STATIONS, INC., et al., Defendants.**

Civ. A. No. 92–T–604–N.

United States District Court, M.D. Alabama, N.D.

Dec. 17, 1992.

Julian L. McPhillips, Jr., Mary A. Goldthwaite, McPhillips, Hawthorne, Shinbaum & Gill, Montgomery, AL, for plaintiff.

Bruce Johnson Downey, III, Montgomery, AL, for defendants.

MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiff Cathleen V. Cronin has brought this lawsuit claiming that, while employed at a convenience store in Montgomery, Alabama, she was sexually harassed to the extent that she was forced to resign. She has named the following as defendants: United Service Stations, Inc., the owner of a number of convenience stores including the one where Cronin worked; Ben S. McNeill, the stockholder-owner of United Service; and Steve Long, the general manager and supervisor of all of United Service's convenience stores. Cronin bases her lawsuit on 42 U.S.C.A. §§ 2000e through 2000e–17, popularly referred to as Title VII of the Civil Rights Act of 1964, as amended. She has properly invoked the jurisdiction of the court pursuant to 28 U.S.C.A. §§ 1331, 1343(a)(4), and 42 U.S.C.A. § 2000e–5(f)(3).

Based on the evidence presented at a nonjury trial on November 9–13, 1992, the court finds that Cronin was sexually harassed and constructively discharged in violation of Title VII and is thus entitled to appropriate declaratory and injunctive relief.

## I. BACKGROUND

The evidence reflects that Cronin, who is white, and three other female employees, who are black, were subjected to hostile and abusive sexual harassment from John Webster, a black male co-employee.

### A.

On July 5, 1991, Steve Long, the general manager and supervisor of the convenience stores owned by United Service, hired Cronin as a cashier at the company's Day Street store. A few days after Cronin began work, the manager of the store resigned. Long offered the position to John Webster, the store's assistant manager, but he turned the job down. Long then offered the position to Cronin who had had previous experience managing a convenience store. Cronin accepted the position, and Webster remained at the store as the assistant manager.

Webster, however, continually interfered with Cronin's management of the store. He verbally abused her, made sexual advances, and harassed her when she was trying to work. For example, one day shortly after Cronin began working at the store, Webster approached Cronin, put his arms around her waist, and said to customers present in the store, "Hey, this is our new manager, Katie, and she hates niggers." Cronin responded, "John, you know that's not true." Webster then said, "So, you like black dick then?" Cronin became, in her words, "extremely embarrassed" and "at a loss for words." She quickly left the store. Another time, Webster asked Cronin to go out and "have a good time with him," but she refused. While Cronin worked at the store, Webster would frequently approach her from behind, put his arms around her shoulders, touch her neck, and sing softly into her ear. When he did this, Cronin asked Webster not to touch her. On one such occasion, Webster touched Cronin on her shoulders and moved his hands down to her waist. When Cronin pulled away from him, Webster started to laugh. Cronin asked him what he was doing. Webster responded, "I just wanted a good feel."

Cronin attempted to institute several changes in the management procedures of the store. Cronin encountered resistance to these changes from Webster. Webster frequently called Cronin a "dumb, old stupid woman." He also told her that a woman could not handle being the manager of the store and that he had made a mistake in letting her take the position. In addition, Webster attempted to undermine Cronin's actions as manager. For example, shortly after Cronin took over as manager, she set up a meeting for all the employees. When no one showed up, Cronin discovered that Webster had told everyone there was no need for a meeting. Webster also informed the employees that they should call him, not Cronin, about problems in the store, and he changed employee schedules without consulting with Cronin. On one occasion, Webster pulled a gun on Cronin

and told her that he was an undercover police agent. On another occasion, when Webster was off-duty, he spent the entire day harassing Cronin. He repeatedly walked in and out of the store and made numerous phone calls to Cronin.

Although Webster warned Cronin not to contact either Long or Ben McNeill, the owner of United Service, Cronin attempted several times to speak to Long about Webster's behavior. Long, however, either put her off or did not return her calls. Cronin then began taking notes to document Webster's actions and to have a list of things to discuss with Long when she had the opportunity.

Finally, on July 25, Webster's behavior culminated in an altercation in the Day Street store parking lot where his verbal abuse was accompanied by an attempt to assault Cronin physically. Earlier that day, when Cronin was out-of-town, Webster had fired an employee at the store. When Cronin later tried to question Webster about this, Webster shouted profanity and sexual remarks at her. Among other profanity, Webster called Cronin a "white ass bitch." He then raised his arm to hit her. Another employee at the store caught Webster's arm before it struck Cronin, although the keys Webster had in his hand scratched Cronin's arm. If Webster had not been stopped by a co-worker, he would have seriously injured Cronin. Cronin fired Webster on the spot, and Webster retorted that no one could fire him. Cronin told him that if he did not leave the premises she would call the police. Webster then threatened Cronin by telling her that he knew where she lived. Cronin became, in her words, "scared that he might really hurt me."

The next day, on July 26, Long met with Cronin, Webster, and several other employees to discuss the incident. At that meeting, Cronin handed Long the notes she had been keeping about Webster's behavior toward her. She also told Long that she was afraid of Webster and that she would never work with any man who tried to hit her. Long looked at Cronin's notes, laughed, folded up the notes, and put them in his pocket. Shortly thereafter, Long transferred Webster to another United Service store.

Less than three weeks later, on August 16, Long showed up at the Day Street store along with Webster. Long informed Cronin that he was reassigning Webster to the store to deal with the store's inventory shortages. Long added that, "I don't expect that you will have a problem with [Webster]." Prior to this announcement, Long had not discussed with Cronin his intentions to reassign Webster to the store. Cronin immediately resigned her position at the store because she was afraid of Webster and could not further tolerate his sexual harassment. Webster replaced Cronin as manager of the store.

Cronin filed an administrative charge of sex discrimination with the Equal Employment Opportunity Commission.[1] The Commission issued a "right-to-sue" letter, and Cronin timely filed this lawsuit under Title VII.

### B.

Three black women were also sexually harassed by Webster. Barbara Barlow was the manager of United Service's Court Street store when Webster was hired there as a cashier, before he went to the Day Street store. Webster asked her out several times, telling her, in her words, "how good he was in bed." Barlow made it clear to him that she was not interested. Webster also frequently put his arms around her, although Barlow would push him away. Barlow never mentioned Webster's behavior or sexual comments to Long because she did not think that he would do anything about it.

Sophie Colquist, who worked as a cashier at the Day Street store under Webster for several months after Cronin resigned, suffered harassment from Webster. When Colquist was in back of the counter run-

---

**1.** Cronin also filed an administrative charge of *race* discrimination with the Commission, but she has not pursued that charge in this court.

ning the cash register, Webster would stand behind her and stare at her rear end. He frequently told Colquist, "I like the way you're shaped," and "I like your butt." He also said, "I would like to try you," which Colquist understood to mean that he would like to have sex with her. On several occasions, Webster made these remarks about Colquist's appearance in front of her daughter. He also asked Colquist out several times, even though she told him that she was married and not interested. Webster's comments made Colquist, in her words, "feel uneasy" and "embarrassed." Webster eventually left the store as manager, but on December 31, 1991, he dropped by the store to wish Colquist a happy new year. While Colquist's daughter was present, Webster exposed his penis to Colquist and told her that he wanted her "to feel it" and to meet him after work. Colquist told him to leave the store. Colquist was reluctant to report Webster's remarks and behavior to management because she was afraid that her husband would find out and go after Webster himself.

Victoria Robertson, another female employee, had similar experiences while working as a cashier under Webster at the Day Street store. Webster frequently touched her, in her words, "wherever he could, my breasts, arms, legs, and behind." He also asked Robertson to have sex with him or "to give him some." Webster often offered to do Robertson's shift reports in return for sex. Almost every day Robertson worked at the store, Webster made sexual advances to her, and, in her words, "he always tried to kiss me." Robertson was reluctant to report this harassment to management because she did not believe that anything would be done about it. Webster repeatedly told her, "I am the best manager Steve [Long] has. He won't do anything to me." Then one day Webster exposed his penis to her. After this, Robertson complained to Long about Webster's behavior. Long did not take her complaints seriously; he laughed and thought it was funny that Webster had exposed himself. However, soon after that, Webster was discharged from the Day Street store and rehired by Long at a store Long had personally leased from United Service.

## II. CLAIM OF SEXUAL HARASSMENT

Cronin claims that as an employee of United Service she was subjected to sexual harassment that was so severe and so pervasive that it created a hostile and abusive working environment in violation of Title VII. From the evidence presented, the court agrees.

### A.

■ When an employee has been sexually harassed, that employee has been discriminated against on the basis of sex. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir.1989). This is true because the employee has been singled out because of her sex. Sexual harassment, therefore, is a form of sex discrimination and as such falls within Title VII's prohibition of employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C.A. § 2000e–2(a)(1).

Courts have recognized two forms of sexual harassment that are actionable under Title VII. The first type, known as *"quid pro quo* harassment," takes place "when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands." *Steele*, 867 F.2d at 1315; *see also Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404–05. The second type, known as "hostile environment harassment," occurs when there is conduct that "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404–05; *accord Steele*, 867 F.2d at 1315.

■ Cronin claims that she suffered the second type of sexual harassment while working for United Service. To establish "hostile environment harassment," a plain-

tiff need not demonstrate a "tangible loss" of "an economic character," *Vinson,* 477 U.S. at 64, 106 S.Ct. at 2404–05; *see also Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 905 (11th Cir.1988) (per curiam). A plaintiff need only show that the conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405, *quoting Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir. 1982). Therefore, while the effect on the employee must be more than de minimis, the employee need not show that she was required to seek psychiatric assistance or that she was incapacitated from performing her job in order to demonstrate that she was adversely and unreasonably affected by the harassment. *See Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991). Moreover, the severity and pervasiveness of the conduct does not turn merely on how many or how few incidents there are; a court must examine "not only the frequency of the incidents, but the gravity of the incidents as well." *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1511 (11th Cir.1989). Finally, the gravamen of any sexual harassment claim is "that the alleged sexual advances were 'unwelcome.' " *Vinson,* 477 U.S. at 68, 106 S.Ct. at 2406. The focus of the court should be on whether the complainant "by her conduct indicated that the alleged sexual advances were unwelcome." *Id.*[2]

However, the Supreme Court has explicitly held that an *employer may not be* held "automatically liable" for all sexual harassment inflicted, or suffered, by its employees. *Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408. Lower courts must consider the circumstances of each particular case before imposing liability. *Id.* Relying on *Vinson,* the Eleventh Circuit Court of Appeals has concluded that employers may be held *directly* liable for any illegal harassment that either it or its agents may have practiced on its employees. *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1557–58 & n. 4 (11th Cir.1987). Under the law of the Eleventh Circuit, an employer may also be held *indirectly* liable for sexual harassment. To establish indirect liability, the plaintiff must show under the theory of *respondeat superior* that the employer "knew or should have known of the harassment in question and failed to take prompt remedial action." *Sparks,* 830 F.2d at 1557, *quoting Henson,* 682 F.2d at 905; *see also Huddleston,* 845 F.2d at 904. Indirect liability reaches those situations where the person who engaged in the unlawful conduct is not the plaintiff's "employer" or "agent" as these terms are used in Title VII, but is, for example, "one of plaintiff's co-workers or [is] a supervisor with no authority over plaintiff." *Sparks,* 830 F.2d at 1558 n. 4.[3] A plaintiff can prove that the employer knew of the harassment by showing that the harassment was open or pervasive enough to

---

**2.** The Equal Employment Opportunity Commission has defined sexual harassment as follows:

"Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

29 C.F.R. § 1604.11(a) (footnote omitted).

**3.** Title VII, which defines the term "employer" to include an employer's "agent," provides in pertinent part:

"The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26."

42 U.S.C.A. § 2000e(b).

charge the employer with constructive knowledge. *Vance,* 863 F.2d at 1512. A plaintiff may also prove an employer's knowledge by showing that she complained to higher management. *Huddleston,* 845 F.2d at 904. Of course, there must be some avenue by which an employee can make the employer aware of the illegal conduct. An employer should not be able to avoid indirect *respondeat superior* liability by simply not giving its employees an opportunity to come forward with their claims of harassment. *See Vinson,* 477 U.S. at 72–73, 106 S.Ct. at 2408; *Vance,* 863 F.2d at 1513–14.

### B.

■ Applying the above principles, the court is convinced that Cronin was sexually harassed by Webster and that the harassment was sufficiently severe and pervasive to alter the working conditions and create an abusive working environment at United Service's Day Street store. As found by the court, Webster said to Cronin, or in her presence, during the very brief period she worked for the store, such things as, "Hey, this is our new manager, Katie, and she hates niggers," and, "So, you like black dick then?"; he frequently approached her from behind, put his arms around her shoulders, touched her neck, and sang softly into her ear; he touched her on her shoulders and moved his hands down to her waist, commenting that he "Just wanted a good feel"; and he called her a "white ass bitch."

The court is also convinced that Cronin indicated to Webster that his advances were not welcome and that Webster knew his advances were unwelcome. The evidence indicates that Cronin "did not solicit or incite" Webster's conduct and that she "regarded the conduct as undesirable or offensive." *Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir.1982). Cronin refused to go out with Webster and she repeatedly asked him not to touch her. Furthermore, as noted previously, Cronin took notes about Webster's behavior and attempted to complain to Long about Webster's actions. Finally, when Webster tried to strike her, Cronin fired him on the spot.

■ The court has thus far focused on harassment which has sexual overtones. However, to be actionable under Title VII, the conduct giving rise to a hostile or offensive work environment need not consist of sexual advances or have clear sexual overtones. *Bell v. Crackin Good Bakers, Inc.,* 777 F.2d 1497, 1503 (11th Cir.1985).[4] For example, conduct of a nonsexual nature that ridicules women or treats them as inferior can constitute prohibited sexual harassment. *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1073 (M.D.Ala.1990) (Thompson, J.). Threatening and bellicose conduct related to a person's sex can also be considered as sexual harassment. *Bell,* 777 F.2d at 1503. As previously stated by the court, Webster frequently called Cronin a "dumb, old stupid woman"; he told her that a woman could not handle being the manager of the store and that he had made a mistake in letting her take the position; he attempted to undermine her actions as manager; and he threatened and attempted to physically injure her.

Webster's comments and behavior were derogatory and insulting to women generally, and overtly demeaning to Cronin personally. Without question, Webster's conduct indicates a lack of respect for women and reflects an attitude that women are to be viewed as only objects of ridicule, abuse, or sexual pleasure. Moreover, Webster's threatening and bellicose conduct directly created the hostile and offensive working environment at the store. The court concludes that but for the fact that Cronin was a woman, she would not have been subject to such harassment.

■ The court further finds that this combination of sexual overtures, demeaning comments, and physical abuse created

4. *See also Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3rd Cir.1990); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 903 (1st Cir.1988); *Hall v. Gus Const. Co., Inc.,* 842 F.2d 1010, 1014 (8th Cir.1988); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987); *McKinney v. Dole,* 765 F.2d 1129, 1138–39 & nn. 20–21 (D.C.Cir.1985).

an environment that adversely and unreasonably affected Cronin's "psychological well-being" and her " 'ability to do [her] job'." *Vance*, 863 F.2d at 1510–11, *quoting Davis v. Monsanto Chemical Co.*, 858 F.2d 345 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989). Webster's harassment interfered with Cronin's ability to fulfill her duties as manager, particularly her ability to complete her paperwork, to organize the employees at the store, and to institute changes in the management of the store. After Webster's attempt to strike her in the parking lot, Cronin specifically told Long that she was afraid of Webster and was unwilling to work with him. Indeed, the prospect of Webster returning to the store forced Cronin to quit immediately her position.

## C.

The court further concludes that United Service is indirectly liable under the theory of *respondeat superior* for the sexual harassment of Cronin by Webster. The court finds that Long, the company's general manager and supervisor, not only knew about the harassment, but laughed about it and was utterly unresponsive in remedying the situation. Long failed to take prompt remedial action against Webster. *Compare with Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir.1989).

Defendants contend that neither Cronin nor any other female employee at United Service ever complained that Webster was sexually harassing them. Long maintains that Cronin at no time mentioned Webster's sexual misconduct, not even during their meeting after the July 25 altercation in the parking lot. Long further contends that he did not believe there was a fight in the parking lot. When he transferred Webster, it was only to avoid further problems, not because he believed Cronin's version of events or to remedy a hostile environment at the store. Long also denies receiving any notes taken by Cronin documenting Webster's behavior. Finally, defendants contend that if any sexual harassment did exist, any employee could have

spoken to McNeill at any time. According to defendants, McNeill had an open door policy and was more than willing to speak with employees about matters of concern to them.

The court rejects defendants' arguments for two reasons. First, the court finds that Cronin did make management aware of Webster's sexual harassment and the hostile working environment at the Day Street store. As general manager of United Service, Long had supervisory powers over all the stores, including the Day Street store. At their meeting on July 26, Cronin informed Long that Webster had called her a "white ass bitch" and that he attempted to hit her. Cronin also specifically told Long that she was afraid of Webster and that she was unwilling to work with him. In addition, Cronin handed Long the notes she had been keeping that documented Webster's behavior. However, Long's response was only to look at the notes and laugh, and fold them up and put them in his pocket. The evidence thus clearly indicates that Long was made aware of the hostile environment at the Day Street store, in general, and of Webster's conduct, in particular. But Long chose to ignore the situation, rather than address it; he considered the situation to be simply funny. The court therefore finds that, rather than discounting Cronin's version of what happened or even making an attempt to determine whether Cronin or Webster was telling the truth, Long simply did not view Cronin's allegation that Webster had sexually harassed her as charging improper conduct and thus as worthy of a full investigation.

Second, even if Cronin did not complain to anyone about Webster's conduct, United Service cannot insulate itself from liability by claiming that it was not made aware of the harassment. The Supreme Court and the Eleventh Circuit have suggested that an employer may be insulated from a claim of hostile environment harassment if the employer has an explicit policy against sexual harassment and if it has effective grievance procedures calculated

to resolve claims of sexual harassment and to encourage victims of harassment to come forward. *See Vinson,* 477 U.S. at 72–73, 106 S.Ct. at 2408–09; *Sparks,* 830 F.2d at 1560.[5] But the evidence here indicates that United Service has no explicit and unequivocal policy against sexual harassment. In fact, it has no policy at all. The policy and procedure manual distributed to all employees contains no provisions regarding sexual harassment. It does not mention the issue of sexual harassment and in no way alerts employees to their employer's interest in correcting the problem. Indeed, the manual does not address the issue of discrimination in any form.

Furthermore, United Service does not have procedures which are "calculated to *encourage* victims of harassment to come forward." *Vinson,* 477 U.S. at 73, 106 S.Ct. at 2408 (emphasis added). Ben McNeill, the owner of the company, may have been willing to speak to employees who approached him about sexual harassment, but this passive management style is not an adequate means of addressing the problem of sexual harassment. Neither McNeill nor Long ever took any affirmative steps to make it clear that they were available to hear complaints of sexual harassment or to encourage employees to come forward with their complaints of such harassment. Moreover, there was no formal mechanism or procedure through which Cronin or any other employee could file a complaint about sexual harassment.

Indeed, the evidence reflects that United Service, and in particular Long, consciously tolerated, if not encouraged, sexual harassment. When Cronin complained to Long about her harassment, he laughed and did not take her allegations seriously. Similarly, when Robertson complained that Webster had exposed himself to her, Long found the incident funny.

D.

The defendants sought to impeach Cronin by showing that she had failed to be honest in her answers to questions posed to her before trial, in particular about experiences unrelated to her employment with United Service. The court agrees that Cronin at times attempted to mislead counsel for the defendants. However, the court is equally convinced that Webster and Long were not fully truthful in their testimony before the court, and in particular in their testimony about harassment and abuse of female employees and the handling of complaints about such harassment. Because none of the principal witnesses has been completely truthful, the court must admit that it has been left in a quandary regarding some of the facts in this case. Nevertheless, having reflected on all the evidence and having found the testimony of some witnesses to be in part true, *see* E. Devitt, C. Blackmar, M. Wolff & K. O'Malley, Federal Jury Practice and Instructions: Civil and Criminal § 15.01 (4th ed. 1992) (a witness may be believed in whole or in part); Pattern Jury Instructions of the District Judges Association of the Eleventh Circuit, Civil Cases, Basic Instruction Three (1990) (same), the court is clearly and firmly convinced of one ultimate fact: that Webster sexually abused and harassed Cronin as described by the court.

The defendants emphasized that Webster was Cronin's subordinate—that is, he was the assistant manager while Cronin was the manager. This fact, while relevant, does not preclude the court from find-

---

**5.** *Vinson* and *Sparks,* therefore, suggest that an employer does not always have to credit the complaining employee's charge in order to avoid Title VII liability. If the employer has an explicit policy against sexual harassment and if it has effective grievance procedures calculated to resolve claims of sexual harassment and to encourage victims of harassment to come forward, then the employer may escape liability even if it wrongly, but in good faith, finds no merit in the charge of the complaining employee. *See also Hawkins v. Ceco Corp.,* 883 F.2d 977, 980 n. 2 (11th Cir.1989) (a plaintiff was not a victim of discrimination if the employer's adverse employment decision was mistaken but made in good faith), *cert. denied,* 495 U.S. 935, 110 S.Ct. 2180, 109 L.Ed.2d 508 (1990); *Connor v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1581 (11th Cir.1985) (same); *Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir.1982) (same). Long did not even attempt to make a good faith determination as to whether Cronin had been a victim of sexual harassment.

ing that Cronin was a victim of sexual harassment. Unlike *quid pro quo* harassment where harassment is directly linked to employment opportunities, *see generally Henson*, 682 F.2d at 908–13, hostile environment harassment, as explained previously, concerns conduct that creates a hostile, offensive, or abusive work environment. This type of environment can be the product of a supervisor harassing a subordinate or a subordinate harassing a supervisor, or of harassment between two equal co-employees.

 The defendants sought to show that Cronin was abused at home by her boyfriend, and thus could not have viewed harassment at work as unwelcome. This argument is entirely without merit. That Cronin may have been abused at home in no way means that Cronin deserved abuse at work, that she "welcomed" Webster's abuse, or that she could not possibly be affected by Webster's actions because she was used to such abuse. In this case, the main issues for the court are determining what occurred at work and whether Cronin and Webster acted reasonably at work. Cronin's experiences at home have no general bearing on whether Cronin was subjected to sexual harassment at work. Abuse of a plaintiff in other settings, such as at home, should not be routinely admitted in cases charging sexual harassment in the work place. Indeed, a court should be careful not to allow one party to a lawsuit to pry so far into the personal and private life of the other party that the litigation itself becomes a tool of abuse and harassment and thus victimizes the latter party in the very manner that Title VII seeks to prohibit. Therefore, absent a showing of a particularized relevance and need to delve into the deeply private sexual life of a party, a court should not allow it. The defendants did not make such a showing in this case.

The defendants suggest that Cronin disliked Webster because he is black and that her accusations against him were racially motivated. Cronin's actions toward Webster and resulting charges against him were not racially inspired. To the contrary, the court is convinced that Webster's conduct—in particular, his statements "So, you like black dick then" and "white ass bitch"—had a distinct racial bent, although motivated predominantly by a sexual bias. The court should censure Webster, not Cronin, for racial bias.

## III. CONSTRUCTIVE DISCHARGE

 To prove constructive discharge, the employee must demonstrate that her working conditions were so intolerable that a reasonable person in her position would be compelled to resign. *Steele*, 867 F.2d at 1317. If the intolerable working conditions are the result of a hostile environment caused by sexual harassment, then the constructive discharge violates Title VII. *Id.* Under this demanding standard, Cronin was constructively discharged.

As noted previously, when Long and Cronin met on July 26 to discuss Cronin's altercation with Webster in the parking lot of the Day Street store, Cronin informed Long that she was afraid of Webster and that she would not work with a man who tried to hit her. However, on August 16, without first soliciting any views from Cronin or even giving her any warning, Long appeared at the store, along with Webster, and informed Cronin that he was reassigning Webster to the Day Street store.

According to Long, he was not concerned about bringing Webster back because he did not believe any incident had occurred. The evidence, as stated however, reflects that Long did not care whether Webster had harassed Cronin; Long viewed much of Webster's offensive conduct as tolerable if not funny. Long further maintains that it was necessary to bring Webster back to deal with severe inventory shortages at the store. But no evidence was presented that Webster had any particular expertise in dealing with inventory shortages. In fact, all of the United Service stores that Webster worked for experienced shortages while he was employed there. Moreover, the credible evidence does not support the defendants' contention that Long had firm and accurate information on August 16

that the inventory shortages at the Day Street store were so severe as to warrant that Cronin receive assistance in managing the store.

The court is thus led to the conclusion that the alleged inventory shortage problem was used as a pretext to bring Webster back to the store in order to force Cronin to quit. Cronin's complaints about Webster were simply a nuisance for United Service; reassigning Webster to the store provided a convenient means to get rid of Cronin, particularly because Cronin had made it clear to Long that she would not work with Webster. This strategy proved quite successful. For Cronin, once she learned that Webster was to be reassigned to the store, she had no other option. To prevent herself from again being subjected to Webster's sexual harassment, she was forced to resign.

Moreover, Cronin's resignation from her employment in the face of Webster's return to the Day Street store was reasonable. What she confronted was unbearable: Webster had sexually harassed and abused her in the past, and it appeared that he would continue to do so with Long's blessing. Her working conditions were so intolerable that a reasonable person in her position would have been similarly compelled to resign. The court, therefore, concludes that Cronin was constructively discharged in violation of Title VII.

## IV. RELIEF

■ The court is thus convinced that Cronin was subjected to sexual harassment while employed by United Service and that she was constructively discharged in violation of Title VII. As a victim of sex discrimination, Cronin is entitled to appropriate relief. First, she is presumptively entitled to backpay and other back benefits she would have received had she not been constructively discharged. *Lengen v. Dept. of Transp.*, 903 F.2d 1464, 1468 (11th Cir. 1990). Because the defendants have not overcome this presumption, the court will award Cronin backpay and other benefits. The court will give the parties an opportunity to agree upon the appropriate amount of backpay and other benefits Cronin should receive. If the parties cannot reach an agreement on this issue, then the court will itself determine, after an additional hearing, how much Cronin should receive in backpay and other back benefits.

■ Second, Cronin is presumptively entitled to immediate reinstatement to a managership with United Service. *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470 (11th Cir.1985). However, the court cannot determine from the current record whether a management position is now available and, if not, how soon one will become available. The court will therefore give the parties an opportunity to resolve this issue. If the parties cannot reach an agreement on this issue, then the court will itself determine, after an additional hearing, the reinstatement issue.

■ Third, Cronin is entitled to an injunction prohibiting the defendants from discriminating against her because of her sex, for, "where there is abundant evidence of consistent past discrimination injunctive relief is mandatory absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law," *Lewis v. Smith*, 731 F.2d 1535, 1540 (11th Cir.1984). Cronin is also entitled to an injunction prohibiting the defendants from retaliating against her because she brought this lawsuit. 42 U.S.C.A. § 2000e–3(a).

Fourth, in light of the evidence that not only Cronin but three other women were also sexually harassed and forced to work in a hostile environment and in light of the fact that in the future Cronin should be able to work in an environment free of sexual discrimination, the court is compelled to enter an injunction requiring the defendants to take affirmative steps to rid United Service of its sexually hostile atmosphere. The court will require the defendants to fashion and implement, within 60 days, policies and procedures with regard to sex discrimination, including sexual harassment. *See Sims*, 766 F.Supp. at 1080. The policies and procedures must include, at a minimum, the following aspects: a prohibition of all forms of sexual

discrimination, including sexual harassment, at United Service; effective grievance procedures calculated to resolve claims of sexual discrimination and to encourage victims of sexual discrimination, including sexual harassment, to come forward with their complaints; and a program to educate all employees of United Service about the law and their obligations under the law regarding sexual discrimination, including sexual harassment. *Id.*

■ Finally, Cronin is entitled to recover reasonable attorney's fees and expenses. 42 U.S.C.A. § 2000e–5(k). The court will give the parties an opportunity to agree to such fees and expenses.

An appropriate judgment will be entered in accordance with this memorandum opinion.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment is hereby entered in favor of plaintiff Cathleen V. Cronin and against defendants United Service Stations, Inc., Ben J. McNeill, and Steve Long;

(2) That the defendants United Service Stations, Inc., McNeill, and Long, their officers, agents, servants, and employees, and those persons in active service and participation with them who receive actual notice of this order by personal service or otherwise, be and they are each hereby ENJOINED and RESTRAINED as follows:

(a) From discriminating against and harassing plaintiff Cronin because of her sex;

(b) From retaliating against plaintiff Cronin because she brought this lawsuit; and

(c) From failing to fashion and implement, within 60 days, policies and procedures with regard to sex discrimination, including sexual harassment;

(3) That plaintiff Cronin have and recover from defendants United Service Stations, Inc., McNeill, and Long backpay and other back benefits she would have re-

ceived had she not been constructively discharged illegally;

(4) That plaintiff Cronin have and recover from defendants United Service Stations, Inc., McNeill, and Long her attorney's fees and expenses;

(5) That plaintiff Cronin is allowed until January 29, 1993, to file a request for the court to determine the issues of reinstatement, backpay, other back benefits, and attorney's fees and expenses, should the parties be unable to agree on these issues by said date.

It is further ORDERED that costs are taxed against defendants United Service Stations, Inc., McNeill, and Long, for which execution may issue.

It is further ORDERED that the clerk of the court shall issue a writ of injunction.

It is further ORDERED that the United States Marshal or its representative shall serve on the defendants United Service Stations, Inc., McNeill, and Long a copy of the memorandum opinion and accompanying judgment entered this date.

DONE.