DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellants, Kristina Conti, Emily Dutton, and Shawna Smith, appeal from the judgment of the Lorain County Court of Common Pleas. This Court affirms in part and reverses in part.
 I. {¶ 2} Conti, Dutton, and Smith (collectively "Employees") each worked for a period of time for a car dealership owned and operated by Appellee Spitzer Auto World Amherst, Inc. Employee benefits were provided to this dealership *Page 2 
through Appellee Spitzer Management, Inc.[1] At the time Employees worked at the dealership, the general manager was Joe Garrett, and the sales managers were Todd Meek and Tim Dalzell. Further, both Spitzer entities were owned and/or controlled by Alan Spitzer.
 {¶ 3} Employees alleged that during their employment they were subjected to sexual harassment on a near daily basis. Conti asserted that Meek and Dalzell routinely viewed pornography on work computers and forced her to view the pornography on numerous occasions. Conti also asserted that Meek rubbed up against her from behind and forced her to touch his buttocks on several occasions. Employees also alleged that they were routinely questioned about the color and type of their underwear, their private sex lives, and their interest in different sexual positions.
 {¶ 4} Based upon her allegations, Conti filed suit against Spitzer, Garrett, Meek, and Dalzell on March 31, 2003. On May 7, 2003, Dutton filed suit against Spitzer and Meek, and finally on March 6, 2006, Smith filed suit against Spitzer, Garrett, and Meek. Following numerous filings, all three cases were consolidated. The complaints included counts of sexual harassment based on hostile work environment and quid pro quo, sex discrimination, negligent retention, civil assault and battery, constructive discharge, retaliation, and intentional infliction of emotional distress. *Page 3 
 {¶ 5} Prior to trial, the claims against Meek and Dalzell were dismissed due to each filing for bankruptcy. A jury trial involving the remaining defendants began on November 15, 2006. At the close of the evidence, the trial court directed a verdict in Garrett's favor on the claims brought by Dutton and Smith. On December 5, 2006, the remaining claims were submitted to the jury. The jury returned a verdict in favor of each of the defendants on all of the outstanding claims. On December 21, 2006, Employees moved for a new trial, alleging judicial bias. The trial court denied the motion on February 8, 2007. Employees timely appealed the trial court's judgment, raising four assignments of error for review.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DENYING [EMPLOYEES'] MOTION IN LIMINE AND ADMITTING EVIDENCE AS TO THEIR PERSONAL LIVES WHILE PRECLUDING [EMPLOYEES] FROM PRESENTING EVIDENCE OF CONDUCT BY SPITZER'S SUPERVISORY PERSONNEL IN THE WORKPLACE DURING WORKING HOURS."
 {¶ 6} In their first assignment of error, Employees assert that the trial court erred in two pretrial rulings regarding the admissibility of certain pieces of evidence. This Court agrees in part.
 {¶ 7} Initially, we note that "a motion in limine does not preserve the record on appeal[;] * * * [a]n appellate court need not review the propriety of such *Page 4 
an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial." (Emphasis omitted.) State v. Grubb (1986), 28 Ohio St.3d 199, 203, citingState v. White (1982), 6 Ohio App.3d 1. The "failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal." Goldfuss v. Davidson
(1997), 79 Ohio St.3d 116, 121.
Employees' Motion in Limine {¶ 8} Employees assert that the trial court erred when it permitted testimony about the following: 1) Dutton's piercings and tattoos, 2) Dutton's promiscuity, 3) Smith's dating history, 4) Smith's subsequent employment, and 5) Conti's dating history. When these matters arose during trial, however, Employees did not lodge an objection. Dutton's mother testified about her daughter's piercings and tattoos and gave an opinion about her promiscuity without an objection. Smith's dating history and employment following her time at Spitzer was questioned in depth without objection. Furthermore, Conti's dating history was questioned repeatedly without objection. Consequently, Employees did not preserve these issues for appellate review. As Employees have not argued plain error in the admission of this evidence, we decline to conduct such a review.
 {¶ 9} Employees, however, preserved an evidentiary challenge with respect to two pieces of evidence: the defendants questioning Smith regarding whether or not she had been to a strip club in the past and questioning Conti about *Page 5 
a videotape depicting her engaged in a sexual act with her husband. We review those issues separately.
 {¶ 10} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. An appellate court will not disturb evidentiary rulings absent an abuse of discretion that produced a material prejudice to the aggrieved party. State v. Roberts,156 Ohio App.3d 352, 2004-Ohio-962, at ¶ 14. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621.
 {¶ 11} With respect to the questioning of Smith, we find no abuse of discretion. During her direct examination, Smith indicated that strippers had once entered Spitzer during working hours and created an "uncomfortable atmosphere." Counsel for Spitzer on cross-examination asked the following question without objection: "And would you agree also, Ms. Smith, that you were no stranger to strippers?" Smith asked that the question be clarified, and counsel asked whether she had visited Diamonds Men's Club. Smith's counsel then objected and the trial court overruled the objection. Smith answered that she had visited that club. Questioning Smith in this regard directly undermined her assertion that strippers at *Page 6 
the dealership made her uncomfortable, thereby attacking her credibility. This line of questioning consisted solely of the question noted above in the midst of a transcript of over 1,600 pages. Consequently, we cannot say that the trial court was unreasonable or arbitrary when it permitted one question on this topic that went directly to Smith's credibility.
 {¶ 12} With respect to the questioning of Conti about a tape that she allegedly made with her husband, we find that the trial court abused its discretion.
 {¶ 13} During Conti's cross-examination, the following colloquy took place over Employees' objections:
 "Q. Well, I hate to have to ask you this. But did viewing your videotape refresh your recollection as to whether you knew that adult film was being made?
 "* * *
 "A. You're asking how I felt about it?
 "Q. No ma'am. I'm asking you, isn't it true you knew it was being filmed?
 "A. I did not know it was being filmed.
 "Q. You would agree with me it was an adult film, correct?
 "A. Yes.
 "Q. And you would agree with me, you were in it, correct?
 "A. Yes
 "* * *
 "Q. You would agree with me at the very end of the tape, Ms. Conti, you said, `Should I turn this thing off now,' didn't you? *Page 7 
 "A. I don't know exactly, but my recollection of what I said was something along the lines that this thing better be off, or turn this thing off."
Spitzer and the remaining defendants used this topic to inform the jury during opening statements that Conti had "starred in a pornographic film[.]" The defendants also sought to use this evidence to minimize Conti's damages, arguing as follows in their closing:
 "And if Ms. Conti was as traumatized by seeing pornography at work, as she and Dr. Kaplan tried to say, why did she hide her own adult video and then lie about it under oath? She told you that she didn't use these exact words of `should I turn this off now.' Maybe not those exact words, but it sure sounds like she knew she was making it to me."
 {¶ 14} "When an employee seeks vindication of legal rights, the courts must not be party to the unnecessary infliction of further humiliation."Knoettgen v. Superior Court (1990), 224 Cal.App.3d 11, 15. Furthermore, "[a] person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment." Katz v. Dole (C.A.4, 1983),709 F.2d 251, 254, fn. 3, overruled on other grounds. Consequently, in sexual harassment cases, "absent a showing of a particularized relevance and need to delve into the deeply private sexual life of a party, a court should not allow it." Cronin v. United Service Stations, Inc. (M.D.Ala. 1992), 809 F.Supp. 922, 932. See also Meritor Sav. Bank, FSB v.Vinson (1986), 477 U.S. 57, 69 (noting that "[w]hile the [trial court] must carefully weigh the applicable *Page 8 
considerations in deciding whether to admit evidence of this kind, there is no per se rule against its admissibility.").
 {¶ 15} Initially, we address the defendants' contention that because Conti made a sexually oriented tape with her husband then the sight of pornography at her workplace could not have been unwelcome. "This rationale would allow a complete stranger to pursue sexual behavior at work that a female worker would accept from her husband or boyfriend."Burns v. McGregor Electronic Industries, Inc. (C.A.8, 1993),989 F.2d 959, 963. Consequently, Conti's private life has no bearing on whether she considered unwelcome the pornography she was forced to view at work.
 {¶ 16} Furthermore, in the instant matter, there was no particularized need to question Conti about a videotape that she allegedly made with her husband. Assuming that the defendants' assertions are correct that Conti knew she was being taped,[2] the videotape's creation had no relevance to the proceedings below. Conti alleged that she was traumatized by repeated, unwanted exposure to pornography that included intercourse between a man and a woman, between a woman and a woman, and between multiple men and women. Whether or not Conti willingly made a tape with her husband in the privacy of her own home has no bearing on whether or not her exposure to pornography at her work place was *Page 9 
unwelcome and damaging. This is not a case in which Conti introduced her own pornography to co-workers and then complained that others viewed something similar.
 {¶ 17} Furthermore, the trial court's action in permitting this questioning was compounded through its later rulings. First, Conti's counsel was prohibited from rehabilitating her regarding the tape when the trial court refused further direct examination. Later, Conti's counsel proffered the testimony of her then husband, Michael Dudek. Pursuant to the proffer, Dudek would have testified that Conti had no idea that the tape was being made and was angry at its creation. Conti's counsel also requested that the tape be shown to the jury to negate any claim that Conti was a "porn star." The trial court without explanation, however, excluded any further testimony regarding the tape and refused to allow the jury to see the tape.
 {¶ 18} Our review indicates that the tape had no apparent relevancy with respect to the claims before the trial court. Moreover, any marginal relevancy was vastly outweighed by the potential prejudice of describing such a tape to the jury. See Evid.R. 403(B). Consequently, we find that the trial court abused its discretion in permitting the defendants to question Conti about the tape.
Defendants' Motions in Limine {¶ 19} Employees also assert that the trial court erred in granting the defendants' motions in limine. Specifically, Employees were prohibited from *Page 10 
asking whether Spitzer employees bought and consumed alcohol during work hours and whether Spitzer employees visited a strip club following a company function. Employees, however, have supplied no law in support of their contention that these rulings were erroneous. Employees essentially argue that denying their motions in limine and granting the defendants' motions was unfair. These motions, however, are independent. The denial of one motion does not require the denial of all others. As Employees have made no legal argument surrounding the rulings on the defendants' motions in limine, they have not met their burden on appeal. See App.R. 16(A)(7).
 {¶ 20} As detailed above, the trial court erred when it permitted the introduction of evidence surrounding the tape made by Conti and her husband. Employees, however, have not demonstrated error in the trial court's remaining evidentiary rulings. Employees' first assignment of error is sustained in part and overruled in part.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DENYING [EMPLOYEES'] MOTION IN LIMINE TO EXCLUDE EVIDENCE PROTECTED BY CONFIDENTIAL COMMUNICATION SPOUSAL PRIVILEGE AND BY ALLOWING [SPITZER] TO QUESTION CONTI ABOUT A VIDEOTAPE WHICH WAS PROTECTED BY SPOUSAL PRIVILEGE."
 {¶ 21} In their second assignment of error, Employees assert that spousal privilege should have prevented any mention of the tape described above. Based *Page 11 
upon our resolution of Employees' first assignment of error, this assignment of error is moot and we decline to address it. See App.R. 12(A)(1)(c).
 ASSIGNMENT OF ERROR III "THE COURT ERRED IN DENYING [EMPLOYEES'] MOTION FOR A NEW TRIAL WHERE THE IMPROPER CONDUCT AND EVIDENT BIAS OF THE TRIAL JUDGE EFFECTIVELY PREVENTED [EMPLOYEES] FROM RECEIVING A FAIR TRIAL AND UNDULY PREJUDICED THE JURY AGAINST [EMPLOYEES]."
 {¶ 22} In their third assignment of error, Employees assert that the trial court erred in denying their motion for a new trial. Specifically, Employees allege that they properly demonstrated judicial bias. This Court disagrees.
 {¶ 23} Civ.R. 59(A)(1) allows a trial court to grant a new trial based on "[i]rregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial[.]" An appellate court will not disturb a decision to deny a motion for a new trial absent an abuse of discretion. Bradley v.Cage (Feb. 27, 2002), 9th Dist. No. 20713, at *3. Abuse of discretion requires more than simply an error in judgment; it implies unreasonable, arbitrary, or unconscionable conduct by the court. Blakemore, 5 Ohio St.3d at 219.
 {¶ 24} The Ohio Supreme Court has held that an appellate court has no jurisdiction to vacate the trial court's judgment on a claim of judicial bias. Beer v. Griffith (1978), 54 Ohio St.2d 440, 441-442 (holding that because only the Chief *Page 12 
Justice or his designee may hear disqualification matters, the court of appeals is without authority to pass upon disqualification or to render void the judgment of the trial court on the basis of judicial bias). Consequently, Employees' assertions that the trial judge made derogatory comments about their counsel's hearing disability cannot support a claim for a new trial.
 {¶ 25} Employees also assert that the trial judge had lunch with a potential Spitzer witness during trial and discussed aspects of the case in the presence of that witness and others. The content of such an allegation is unquestionably troubling. However, we are equally troubled by Employees' admission during oral argument that such an allegation was and is wholly unsubstantiated. In their motion for a new trial, Employees described the judge's conduct as a "flagrant and public disregard for the integrity of his office[.]" They went on to state that the judge's behavior was "shocking and [made] a mockery of the judicial system." Employees went as far as to assert that the trial judge had violated Ohio's Code of Professional Responsibility.
 {¶ 26} In support of the above argument, Employees supplied affidavits from their counsel and Smith. Both affidavits assert that an unidentified person witnessed the trial judge's conduct and reported it to Smith. This unnamed individual never spoke with trial counsel for Employees and allegedly refused to become involved in the matter. Consequently, Employees' counsel asserted that a member of the judiciary committed unethical conduct based upon unsubstantiated *Page 13 
hearsay from an unidentified source. While we would condemn such conduct by the court if the evidence demonstrated that it occurred, we hasten to condemn such serious allegations made with a lack of any reliable supporting evidence.
 {¶ 27} Based upon our review, Employees presented no reliable evidence in support of their claims regarding the trial judge's alleged irregularity. Consequently, we find no abuse of discretion in the trial court's judgment denying the motion for a new trial. Employees' third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV "THE JURY'S VERDICTS IN FAVOR OF [SPITZER] WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL."
 {¶ 28} In their final assignment of error, Employees assert that the jury's decision was against the manifest weight of the evidence. As we sustained a prejudicial evidentiary error that requires retrial with respect to Conti, our review of the weight of the evidence is limited to Smith and Dutton.
 {¶ 29} In State v. Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, the Ohio Supreme Court clarified the distinction between the civil and criminal manifest weight of the evidence standards of review. TheWilson Court stated that the civil manifest weight of the evidence standard was enunciated in C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus, which held that "[judgments supported by some competent, credible evidence going to all the *Page 14 
essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." Wilson at ¶ 24.
 {¶ 30} Federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112. Plumbers Steamfitters Joint Apprenticeship Commt.v. Ohio Civ. Rights Comm. (1984), 66 Ohio St.2d 192, 196. Therefore, in order to demonstrate a prima facie case of sexual harassment, each plaintiff must produce evidence of the following:
 "(1) she was a member of a protected class;
 "(2) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature;
 "(3) the harassment complained of was based upon sex;
 "(4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiffs work performance and creating an intimidating, hostile or offensive working environment that affected the psychological well-being of the plaintiff and
 "(5) the existence of respondeat superior liability." (Citations omitted). Cully v. St. Augustine Manor (Apr. 20, 1995), 8th Dist. No. 67601, at *7. See, also, Cechowski v. The Goodwill Indus. of Akron, Ohio, Inc. (May 14, 1997), 9th Dist. No. 17944.
 {¶ 31} In order to determine whether an environment is sufficiently hostile to warrant a finding of sexual harassment this Court examines the totality of the circumstances including:
 "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's *Page 15 
work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." Harris v. Forklift Sys. Inc. (1993), 510 U.S. 17, 23.
We also note that the standards for judging hostility are demanding such that "the ordinary tribulations of the work place, such as, sporadic use of abusive language, gender-related jokes, and occasional teasing" will not constitute a hostile work environment. (Quotations and citation omitted.) Faragher v. Boca Raton (1998), 524 U.S. 775, 788.
 {¶ 32} Moreover, the Sixth Circuit has established the standards by which Smith and Dutton might prove their constructive discharge claims based on sexual harassment.
 "A finding of constructive discharge in this circuit requires an inquiry into both the objective feelings of the employee and the intent of the employer * * * This court has * * * held that `proof of discrimination alone is not a sufficient predicate for a finding of constructive discharge, there must be other aggravating factors.' We have also required some inquiry into the employer's intent and the reasonably foreseeable impact of its conduct on the employee. . . . Thus it would appear that the courts have been trying to create a two pronged test whereby the feelings of the reasonable employee would not be enough to show discharge without at least some foreseeability on the part of the employer." (Alterations sic.) Wheeler v. The Southland Corp. (C.A.6, 1989), 875 F.2d 1246, 1249, quoting Yates v. Avco Corp. (C.A.6, 1987) 819 F.2d 630, 636-37.
The Wheeler court continued that
 "the constructive discharge issue depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the *Page 16 
employee. This court has also endorsed the well recognized rule in labor relations that a man is held to intend the foreseeable consequences of his conduct. Therefore, an employee can establish a constructive discharge claim by showing that a reasonable employer would have foreseen that a reasonable employee (or this employee, if facts peculiar to her are known) would feel constructively discharged." (Internal citations and quotations omitted.) Id.
Accordingly, to prevail on their claim of constructive discharge premised on a hostile working environment, Smith and Dutton were required to demonstrate a hostile working environment and "show that a reasonable employer would have foreseen that [they] would resign, given the sexual harassment [they] faced." Id.
 {¶ 33} In support of their claims, Dutton and Smith testified. They also offered the testimony of former Spitzer employees Kelley Masa, Michael Williams, and Doug Reynolds, and the testimony Dutton's mother, Donna Dutton, and Sharp's aunt, Traci Kreig. Finally, Dutton elicited the testimony of Dr. Robert Kaplan.
 {¶ 34} Smith testified as follows. She was subjected to harassment by Meek on nearly a daily basis. Meek routinely asked if she was wearing underwear, what color her underwear were, and what type of underwear she was wearing. Once, Smith called in to tell Meek that she would be late for work that day. Meek responded by asking Smith to "scrub it" before coming to work. Smith understood this comment to be sexual in nature. On the final day of her employment, Smith was discussing the fact that her infant child had thrush. According to Smith, Meek then stated that the infant "shouldn't be sucking on my *Page 17 
vagina." Smith went immediately to Ruth Sadowsky to report Meek's comment. Sadowsky, a financial manager for Spitzer, had Smith write a report detailing the harassment she described. Smith detailed the "scrub it" incident that had occurred six weeks earlier and Meek's comment that day. Smith did not report any other alleged harassment during her employment.
 {¶ 35} Smith's aunt, Kreig, testified as follows. Smith was happy and very upbeat when she began working at Spitzer. As she continued her employment, she became downtrodden. Kreig, however, had no direct knowledge of the events allegedly occurring at Spitzer.
 {¶ 36} Dutton testified as follows. During the first week of her employment, when she was seventeen years old, Meek asked to see her breasts. Like Smith, Dutton stated that Meek asked her daily about the color of her bra or underwear. Meek also asked whether Dutton and her boyfriend engaged in anal sex and whether Dutton had performed oral sex. Meek further asked whether Dutton had ever been with another woman sexually. Dutton also recalled one event in which she stood from a chair to allow Meek to use a typewriter. Upon Dutton standing, Meek asked "So are you going to go underneath the counter and please me?" On another occasion, Meek walked past a van in Spitzer's showroom and asked Dutton if she would "get in there with him and give him a lap dance." On still another occasion, Dutton recalled that the other sales manager, Dalzell, asked her to spread her legs when she was sitting on a table so that he could see up *Page 18 
her skirt. Dutton, however, never spoke to anyone at Spitzer regarding this alleged harassment.
 {¶ 37} Dutton's mother, Donna Dutton, testified as follows. Her daughter became depressed and withdrawn during her employment at Spitzer. At one point, her daughter no longer wanted to go to work, stating that "[t]hey are a bunch of perverts." Like Smith's aunt, Dutton's mother had no direct knowledge of the alleged harassment.
 {¶ 38} Former Spitzer employee, Michael Williams, testified as follows. He witnessed Meek sexually harass Conti and Dutton. With respect to Dutton, Williams overheard Meek on several occasions commenting on Dutton's underwear and breasts. During cross-examination, Williams admitted that he was currently suing Spitzer for racial discrimination.
 {¶ 39} Another former employee, Doug Reynolds, testified as follows. He worked with Conti and Dutton. He witnessed pornography on the computers belonging to Dalzell and Meek. Furthermore, he witnessed Meek attempt to solicit oral sex from Dutton. During cross-examination, Reynolds testified that he believed the solicitation was in jest as Dutton was willingly involved in the conversation.
 {¶ 40} Finally, a third former Spitzer employee, Kelly Masa, testified as follows. She also witnessed pornography on the computers belonging to Dalzell *Page 19 
and Meek. Moreover, she occasionally heard comments regarding bras and underwear directed toward Conti, Smith, and Dutton.
 {¶ 41} In support of her claim for damages, Dutton also presented the testimony of Dr. Robert Kaplan. Kaplan diagnosed Dutton with an adjustment disorder that was a mixture of anxiety and depression and an undifferentiated somataform disorder. Kaplan opined that Dutton's problems were either created or exacerbated by harassment at Spitzer.
 {¶ 42} In their defense, the defendants called Garrett, Meek, Sadowsky, Dr. Phillip Resnick, and attorney Anthony Giardini. The defendants also called former Spitzer employees Tanya Teneyke, Chris Revolinsky, Steve Porter, and Tiffany Hodkey.
 {¶ 43} Hodkey testified that she had worked at Spitzer as a receptionist. She noted that she had never witnessed nor been subjected to any sexual harassment while at Spitzer. Similarly, Revolinsky testified that he had worked with Meek and had never witnessed him sexually harass anyone at Spitzer. Along that same line of testimony, Teneyke stated that she had worked at Spitzer for 5 years. During that time, Teneyke never witnessed any sexual harassment. Finally, Porter testified that he previously worked at Spitzer and had never witnessed any sexual harassment take place at the dealership.
 {¶ 44} Spitzer also presented the testimony of Anthony Giardini. Giardini testified as follows. As an attorney for Spitzer, he drafted or assisted in drafting *Page 20 
the sexual harassment policies implemented by Spitzer. The policies provided that any employee who felt harassed should report the harassment to management. As the policies progressed, more contact persons were added, including Alan Spitzer and Giardini himself. Giardini noted that the policies were not perfectly written but placed employees on notice that harassment would not be tolerated. Giardini concluded by noting that neither Dutton nor Smith had contacted him about the alleged harassment.
 {¶ 45} Garrett testified as follows. He admitted to viewing pornography on his computer at work. Garrett admitted that it was inappropriate and a poor choice to view such materials at work. He stated that the material was often attached to emails, but that his actions were nonetheless inappropriate. Garrett, however, denied the assertions that Smith, Conti, or Dutton was exposed to pornography. Garrett asserted that he viewed pornography alone on every occasion that it was viewed. Garrett also indicated that he had never witnessed any sexual harassment at the dealership and that no employee had ever come to him to complain about harassment.
 {¶ 46} Like Garrett, Meek testified that he viewed pornography on his work computer. Meek also testified that he always viewed the pornography alone and had never shown pornography to Smith, Conti, or Dutton. Meek denied ever making sexually suggestive comments to Smith, Conti, or Dutton. Meek testified *Page 21 
that he was taken aback by the accusations and financially devastated from defending against them.
 {¶ 47} Sadowsky testified that she had received a complaint from Smith about a comment made by Meek and requested that Smith write out a detailed statement. Sadowsky indicated that Smith complained of two specific comments made by Meek, but made no mention of any other harassing behavior. In addition, Sadowsky noted that Dutton had never complained to her about any alleged harassment.
 {¶ 48} Finally, Dr. Phillip Resnick testified on behalf of the defendants. Dr. Resnick interviewed Dutton for 3.5 hours, reviewed her deposition, and reviewed the report generated by Dr. Kaplan. Dr. Resnick disagreed with Dr. Kaplan's diagnosis. Specifically, Dr. Resnick concluded that Dutton's disorders were preexisting and not caused by the alleged harassment. Furthermore, Dr. Resnick indicated that Dr. Kaplan did not rule out medical causes for Dutton's symptoms, invalidating his diagnosis. When describing Dutton's answers during the interview, Dr. Resnick noted as follows: "I've never seen that amount of inconsistency compared to other people, even in medical/legal situations."
 {¶ 49} Based upon the evidence presented, the jury had competent, credible evidence before it to support its finding that Smith and Dutton were not subjected to a hostile work environment. The jury was presented with two very different views of the workplace at Spitzer. Employees and their witnesses presented an *Page 22 
atmosphere rife with crude comments and sexual innuendo. In contrast, Spitzer and its witnesses presented testimony that no inappropriate behavior took place at the dealership. There is little question that the jury was best situated to determine the credibility of these witnesses and determine which atmosphere existed at Spitzer. We find no error in the jury's apparent reliance on the testimony of Spitzer's witnesses. See Seasons Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80-81, (noting that "[a] reviewing court should not reverse a decision [on manifest weight grounds] simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.").
 {¶ 50} Furthermore, while the jury heard conflicting testimony about the atmosphere at Spitzer, one relevant fact was undisputed. Smith and Dutton testified that the harassment occurred on a daily basis. Both, however, conceded that they had never mentioned this daily harassment to anyone in their lives prior to filing suit against Spitzer. From this admission, the jury was free to find that Smith and Dutton lacked credibility with respect to describing the frequency and severity of the alleged harassment.
 {¶ 51} Upon our review, the jury had before it competent, credible evidence to find in favor of the defendants on the claims brought by Dutton and Smith. The jury's verdict, therefore, was not against the manifest weight of the evidence.
 {¶ 52} Employees' fourth assignment of error is moot with respect to Conti and overruled with respect to Smith and Dutton. *Page 23 
 III. {¶ 53} Employees' first assignment of error is sustained in part and overruled in part. Employees' second assignment of error is moot and we decline to address it. Employees' third assignment of error is overruled. Finally, Employees' fourth assignment of error is moot with respect to Conti and overruled with respect to Smith and Dutton. The judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with this opinion.[3]
Judgment affirmed in part, reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27. *Page 24 
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed equally to all parties.
SLABY, J. CONCURS
[1] For ease, we refer to the Spitzer entities collectively as "Spitzer."
[2] We cannot examine the validity of these assertions as the videotape was lost prior to its transmission to this Court.
[3] We note that the sole error found in the proceedings related to evidence concerning only Conti. Consequently, the judgments related to Smith and Dutton are affirmed in their entirety.