**Shirley HUDDLESTON, Plaintiff–Appellant,**

v.

**ROGER DEAN CHEVROLET, INC., Defendant–Appellee.**

No. 86–5086.

United States Court of Appeals, Eleventh Circuit.

May 20, 1988.

---

Mark A. Cullen, Cullen & Szymoniak, P.A., Lake Worth, Fla., Michael Masinter, Ft. Lauderdale, Fla., for plaintiff-appellant.

Terrence F. Dytrych, Slawson & Burman, Garry Russo, North Palm Beach, Fla., for defendant-appellee.

Before RONEY, Chief Judge, KRAVITCH, Circuit Judge, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

Shirley Huddleston appeals from the judgment of the United States District Court for the Southern District of Florida in favor of Roger Dean Chevrolet, Inc. ("RDC") after a trial on the merits in this sexual harassment action brought pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Huddleston's complaint alleged that she was the victim of sexual harassment while employed at RDC, that such sexual harassment caused her constructive discharge and that she suffered disparate treatment with respect to promotions, salary, job assignments and hours, disciplinary measures, vacation time and other benefits because of her sex. We affirm in part, and reverse and remand in part.

Huddleston worked for RDC, a car dealership in West Palm Beach, Florida, as a sales representative from August, 1978 through October, 1981. She was the first woman to work in new car sales at RDC. The new car showroom operated on an "open floor" system, which allowed the first salesperson to reach the customer to make the sale. The district court observed that this system created an extremely competitive environment and earned RDC the reputation of being a "shark tank."

Shortly after Huddleston began working at RDC, Philip Geraci, a fellow sales representative, asked her if she thought he was good looking. When Huddleston replied that she did not date men with whom she worked, Geraci said, "We'll get together and box you out. You're going to be hurt." "Boxing" occurs when salesmen cover every door to the showroom floor and prevent a new salesperson from meeting customers. Geraci and other salesmen engaged in this practice on several occasions.

In addition to the "boxing," Geraci and several other salesmen found other ways to interfere with Huddleston's sales efforts. They expelled gas in her presence during her sales presentations. Additionally, Geraci and his "cronies" made derogatory comments to Huddleston, sometimes in the presence of customers, which included calling her a bitch and a whore.

Huddleston's appearance also was the subject of her coworkers' ridicule. They teased her about her wig, threatening to pull it off and called her a "bald-headed woman with a wig." Although RDC's dress code required women to wear dresses or skirts, Huddleston obtained permission to wear slacks. This situation prompted the salesmen to remark, "We're going to take your pants off and put a skirt on you," and "we're going to take your clothes off to see if you are real." Ken Rummel, the sales manager, was present at sales meetings when these comments were made. There is some evidence that Gary Massey, the general manager, knew of these remarks as well.

Huddleston complained to Massey about Geraci's conduct at least twice. After the second complaint, Massey threatened to fire both Geraci and Huddleston if the

problems continued. Geraci laughed at Massey's warning. Rummel also talked with Geraci about his bickering with the appellant. During this discussion, Rummel indicated that he would fire Geraci the next time Huddleston complained, even if she was wrong. Eventually, RDC terminated Geraci's employment. Geraci's discharge, however, was not related to his conflict with the appellant.

Rummel and Huddleston also experienced difficulties while employed at RDC. The evidence at the trial revealed that Rummel yelled at the appellant in front of other employees almost daily. He also grabbed her by the arm once and forcibly moved her a few feet. On one occasion Rummel suspended Huddleston for three days because she failed to "T.O." a customer. "T.O.ing" requires a sales representative to bring a customer to the sales manager after the receipt of a signed buyer's order and deposit. The district court found that this suspension was proper, given the importance of the procedure in the automobile business.[1] The district court also observed that Rummel, because of his "sergeant-type" personality, yelled at everyone and frequently disciplined employees in an effort to maximize sales.

Because of his problems with Huddleston, Rummel, according to his testimony, left RDC and accepted a job with a different dealership. After Rummel left RDC, Huddleston telephoned him to discuss renting his townhouse and to seek his advice on the merits of purchasing an ice cream truck for her daughter's use in business. Huddleston testified that "things calmed down" at RDC after the departures of Geraci and Rummel.

In 1981, the appellant, with the assistance of fellow sales representative William Foster, picked out an ice cream truck for her daughter. Foster's wife was involved in a similar business. Apparently, the route Huddleston chose for her daughter overlapped the route utilized by Foster's wife to some extent. Soon after the appellant purchased the truck, it was vandalized, and Huddleston received several threatening phone calls. During the trial, Huddleston testified that she believed Foster made these anonymous calls.

A few weeks later, in October, 1981, Huddleston took a few days of sick leave to recover from a sinus infection. After three or four days away from the job, she was told to turn in her demonstrator. In the new car sales business, according to the unrebutted testimony, the taking of a demonstrator without replacement is tantamount to discharge.[2] Although the appellant sought an explanation for this decision from Roger Dean, Massey and Richard Blanchard, the sales manager at that time, she received no response.

Huddleston and Massey both testified that the appellant feared that, unless she resigned, Foster would be sent to tow her demonstrator, would damage it and she would be liable for the damage. Huddleston's handwritten resignation letter, however, stated: "For mine and my daughter's security (and safety) I respectfully submit my resignation, terminating my employment at Roger Dean Chevrolet. [Signed] Shirley Huddleston." Although Massey did not ask her to stay, he testified that Huddleston could have remained if she had wished.

After exhausting her administrative remedies, Huddleston filed this action in district court on April 3, 1983. The case was tried on December 3 and 4, 1984. The district court held that Huddleston failed to prove a prima facie case of sexual harassment. Alternatively, the district court concluded that even if the plaintiff had proved a prima facie case, she had not been constructively discharged; rather, she quit her job because of a private dispute with a fellow employee.

■ The district court first held that Huddleston failed to establish a prima facie

---

1. The record indicates that failure to T.O. was grounds for dismissal at another local dealership.

2. In a footnote, the district court observed that the demonstrator policies of two other local dealerships indicate that there are other reasons for a recall, for example, the sale of the demonstrator.

case of sexual discrimination based on sexual harassment. To establish a prima facie case under this theory, the plaintiff must prove that (1) she is a member of the protected group, (2) was the subject of unwelcome sexual harassment, (3) the harassment occurred because of her sex, (4) the harassment affected a "term, condition, or privilege" of her employment and (5) the employer knew, or should have known, of the harassment and failed to take remedial action. *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir. 1982). Although the district court determined that Huddleston made out a prima facie case on the first four *Henson* elements, it concluded that the appellant failed to prove the fifth, the *respondeat superior* requirement.

■ Generally, to prove *respondeat superior* in a hostile work environment sexual harassment case, the plaintiff must demonstrate that the employer knew or should have known of the harassment and failed to take prompt action to remedy the violation. *Henson*, 682 F.2d at 905. The employee can show that the employer had knowledge of the harassment by proving that she complained to higher management of the problem or by demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises. *Id*. In the instant case, the district court found that when Huddleston complained to Massey about Geraci's behavior, RDC had notice of the harassment and was under a duty to take prompt remedial action. The district court concluded that RDC did take such remedial measures because both Massey and Rummel threatened to fire Geraci. Huddleston insists that this conclusion is erroneous because Massey threatened to fire her as well as Geraci if the bickering continued. Although we note that Massey's response is problematic, Rummel's admonition—that he would fire Geraci if Huddleston complained again, even if she was wrong—constitutes prompt remedial

action for the harassment perpetrated by Geraci.

■ The district court also found that Rummel, Huddleston's supervisor, participated in and was aware of other harassment. This court has held recently that when a plaintiff's alleged harasser acts as an agent of the employer, then the harasser is the employer for purposes of Title VII. *Sparks v. Pilot Freight Carriers*, 830 F.2d 1554, 1557–59 (11th Cir.1987).[3] The decision in *Sparks* followed the Supreme Court's endorsement of the application of common law agency principles in analyzing employer liability in sexual harassment cases. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49, 63 (1986). In *Sparks*, the plaintiff's supervisor, who had "actual and apparent authority to alter [the plaintiff's] employment status—including authority to fire her," sexually harassed the plaintiff. 830 F.2d at 1560. Under such circumstances, the plaintiff did not have to prove that the employer knew or should have known of the conduct: "This liability is direct; the employer cannot find shelter in the claim that it neither had notice of or approved of the unlawful conduct." *Id*. at 1559, citing *Vinson*, 477 U.S. at 71, 106 U.S. at 2408, 91 L.Ed.2d at 63.

Rummel's participation in the sexual harassment of Huddleston was in the course of "exercis[ing] the authority delegated to him by his employer." *Sparks*, 830 F.2d at 1559. When Rummel grabbed Huddleston by the arm and physically moved her a few feet, he berated her for her job performance. The district court concluded that this action created a hostile working environment and that it would not have occurred but for Huddleston's sex. The district court also found that Rummel was present at sales meetings when employees other than Geraci made derogatory comments about Huddleston that carried sexual connotations. Rummel supervised

---

**3.** Title 42 U.S.C. § 2000e(b) provides in pertinent part:

    (b) the term employer means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, *and any agent of such a person*.... (Emphasis added.)

20–40 employees and possessed the authority to fire Huddleston or otherwise alter her employment status. Thus, *Sparks* controls, and Huddleston made out a prima facie case against RDC for the sexual harassment attributable to Rummel.

The district court held alternatively that, even if Huddleston proved a prima facie case of sexual harassment, she still could not prevail because she failed to prove that the discrimination caused her constructive discharge. As our following discussion demonstrates, the district court's conclusion that Huddleston was not constructively discharged was not clearly erroneous. However, we disagree with the district court's determination that, absent a showing of constructive discharge, the appellant is not entitled to relief under Title VII.

■ It is well settled that a plaintiff who alleges discrimination by sexual harassment does not have to demonstrate a "tangible loss" of an "economic character" in order to prove a violation of Title VII. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed. 2d 49, 58 (1986); *Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir.1982). Assuming the other *Henson* factors are satisfied, a plaintiff need only show that the pattern of sexual harassment subjects her to disparate treatment with respect to terms, conditions or privileges of employment. *Henson*, 682 F.2d at 902. The district court concluded that Huddleston made such a showing in this case.

■ Huddleston does not seek reinstatement. Further, the district court correctly held that her evidence of lost commissions was too vague to provide a basis for the award of backpay. The prima facie case for sexual harassment attributable to Rummel, however, may entitle her to recover nominal damages and, thus, she could become eligible for an award of attorneys fees. *Henson*, 682 F.2d at 905. Accordingly, we must remand for proceedings on the question of damages resulting from Rummel's participation in the harassment while he acted as an agent of RDC.

Huddleston also claims that the sexual harassment she experienced at RDC became so intolerable that her resignation amounted to a constructive discharge. The dealership responds that Huddleston's resignation resulted from a private dispute with Foster over the ice cream truck.

■ A constructive discharge can result when "the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation...." *Young v. Southwestern Savings & Loan Assoc.*, 509 F.2d 140, 144 (5th Cir.1975).[4] If the intolerable working conditions are the result of a hostile environment caused by sexual harassment, then the constructive discharge violates Title VII. *Henson v. City of Dundee*, 682 F.2d 897, 907 (11th Cir. 1982). Constructive discharge is a question of fact, which we review under the clearly erroneous standard. *Wardwell v. School Bd. of Palm Beach Co., Fla.*, 786 F.2d 1554, 1557 (11th Cir.1986).

■ The evidence before the district court supports its conclusion that Huddleston's resignation was not the result of a constructive discharge. First, the appellant's notice of resignation stated that she was quitting because she feared for her own and her daughter's safety. Second, ample evidence supports the district court's finding that Huddleston's fears stemmed from the ice cream truck dispute. Huddleston testified that she thought that Foster made threatening telephone calls about the ice cream truck. Foster had participated in the harassment led by Geraci, so Huddleston's decision to resign did have some connection to her employment. Still, the district court's finding that the resignation was due primarily to the ice cream truck incident is a plausible interpretation supported by substantial evidence and is not clearly erroneous. *See Baylor v. Jefferson Co. Bd. of Education*, 733 F.2d 1527, 1532 (11th Cir.1984) (trial court's finding, which

4. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

constituted a choice between different interpretations that were each supported by the evidence, was not clearly erroneous).

Huddleston maintains also that the recall of her demonstrator was tantamount to a notice of discharge. The record contains unrebutted testimony that, in the new car sales business, the retaking of an employee's demonstrator is the equivalent of firing that employee. The appellant insists that RDC's request that she turn in the demonstrator created intolerable working conditions that forced her to resign. *See Young*, 509 F.2d at 144. Although the retaking of the demonstrator could have been construed as an indication that Huddleston was no longer welcome at RDC, the district court properly reached the opposite conclusion. Huddleston's resignation letter did not mention the retaking of the demonstrator as a reason for her decision; rather, it addressed only Huddleston's concern for her daughter's and her own safety. Given this substantial evidence and the trial court's refusal to credit the appellant's testimony that she resigned because of the sexual harassment,[5] we cannot say that the district court clearly erred in determining that Huddleston was not constructively discharged.

Finally, Huddleston alleges disparate treatment concerning promotions, salary, job assignments and shift hours, disciplinary measures, vacation time and other benefits. After carefully reviewing the record and the relevant law, we conclude that the district court did not err in finding these charges to be without merit.

AFFIRMED in part, REVERSED in part and REMANDED for further proceedings not inconsistent with this opinion.

---

5. The district court made this credibility choice because Huddleston's principal antagonists, Rummel and Geraci, had left RDC several months before her resignation.