Patricia GROSS, Plaintiff–
Appellant/Cross–
Appellee,

v.

BURGGRAF CONSTRUCTION COMPA-
NY; George Randall Anderson, Defen-
dants–Appellees/Cross–Appellants.

Nos. 94–8054, 94–8061.

United States Court of Appeals,
Tenth Circuit.

April 25, 1995.

Jane A. Villemez of Graves & Villemez, P.C., Cheyenne, WY, for plaintiff/appellant.

Mark L. Carman of Williams, Porter, Day and Neville, P.C., Casper, WY, for appellee/cross-appellant Burggraf Const. Co., (Marvin L. Tyler of Bussart, West, Rossetti, Piaia and Tyler, P.C., Rock Springs, WY, with him on the brief), for defendant/appellee George Randall Anderson.

Before: ANDERSON, McWILLIAMS and ALARCÓN,* Circuit Judges.

ALARCÓN, Circuit Judge.

Patricia Gross appeals from the order granting summary judgment in favor of Burggraf Construction Company ("Burggraf") and George Randall Anderson ("Anderson"), in her action for gender discrimination, filed pursuant to 42 U.S.C. § 2000e (1988 & Supp. IV 1992) ("Title VII"),[1] and for wrongful discharge. During the 1990 construction season, Gross was employed as a water truck driver for Burggraf, primarily under the supervision of Anderson.

---

* Honorable Arthur L. Alarcón, United States Senior Circuit Judge for the Ninth Circuit, sitting by designation.

1. 42 U.S.C. § 2000e–2(a) (1988) provides, in pertinent part that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin

. . . .

Gross asserts, *inter alia,* that Anderson embarrassed and humiliated her in front of other Burggraf employees; that he called her "dumb" and used profanity in reference to her, including calling her a "cunt"; and that he stated over the CB radio to another employee, "Mark, sometimes don't you just want to smash a woman in the face?" Burggraf cross-appeals from the denial of its motion to strike materials submitted by Gross in opposition to its motion for summary judgment.

We conclude that Gross failed to present sufficient admissible evidence to demonstrate that she was subjected to gender discrimination. We do not reach the issues raised in the cross-appeal because our independent review of the admissible evidence has persuaded us that we must affirm.

## CONTENTIONS ON APPEAL

Gross seeks reversal of the order granting summary judgment. Gross frames the issues on appeal as follows:

1. Does a genuine issue of material fact exist as to whether the construction company's supervisor harassed its female driver because of her gender?

2. Does a genuine issue of material fact exist as to whether the misconduct inflicted upon the female employee was sufficiently severe to create a hostile work environment?

■ Gender discrimination can based upon sexual harassment or a hostile work environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Gross has not asserted that she was subjected to sexual harassment, in the form of "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Id.* (citations omitted). Therefore, there is only one issue on appeal: did the district court err in granting summary judgment because there is a genuine issue of material fact in dispute regarding whether Anderson's conduct and statements created a hostile work environment for Gross?

## PERTINENT FACTS AND PROCEDURAL HISTORY

Burggraf is a road construction company. Most of Burggraf's employees are hired on a seasonal basis. The construction season generally runs from May to October of each year. Gross drove a water truck for Burggraf in 1989. Her employment was terminated on October 20, 1989.

Gross was hired again by Burggraf as a truck driver for the 1990 construction season. In mid-May, Gross was assigned to drive a water truck for the Jenny Lake Project in the Grand Teton National Park. Anderson was the supervisor of the Jenny Lake Project. He was responsible for supervising more than 100 individuals.

Gross was an hourly employee. She was subject to being released from work at any time that her services were no longer needed. Gross was initially paid $12.50 per hour for her work on the Jenny Lake Project. Toward the end of the summer, her salary was increased to $13.50 per hour. Gross worked more hours on the Jenny Lake Project than any other truck driver employed by Burggraf.

It is undisputed that Gross was laid off on October 2, 1990, because Burggraf no longer needed the services of a water truck driver on the Jenny Lake Project. Paving operations on the Jenny Lake project were commenced on September 10, 1990; the final paving was completed on October 3, 1990. As the paving operations began to wind down, the need for the water truck diminished. On September 30, 1990, Gross was sent home early because there was nothing for her to do. On October 2, 1990, Gross was informed that she was being laid off because the water truck was no longer needed for the Jenny Lake Project. The water truck was not used on the Jenny Lake Project after October 2, 1990.

On September 28, 1993, Gross filed this action against Burggraf and Anderson. In count one, Gross alleged that she was subjected to gender discrimination in violation of Title VII and retaliation because she contemplated filing a claim with the EEOC. In

count two, she alleged a claim of wrongful termination in violation of state law.

Burggraf and Anderson moved for summary judgment regarding both claims. On April 28, 1994, the district court granted the defendants' motions for summary judgment based upon its determination that there were no genuine issues of material fact regarding either of Gross' claims. Burggraf also filed a motion to strike materials submitted by Gross in opposition to its motion for summary judgment. The district court denied the motion to strike.

Gross has timely appealed from the grant of summary judgment of her claim for violation of Title VII. She has not appealed from the grant of summary judgment of her wrongful discharge state law claim. Burggraf filed a timely cross-appeal from the denial of its motion to strike materials submitted in opposition to its motion for summary judgment.

## ANALYSIS

### 1. *Jurisdiction*

■ As a threshold matter, we must determine whether Gross' appeal is properly before us. Gross maintains that we have jurisdiction over her appeal pursuant to 28 U.S.C. § 1291 (1988).[2] Rule 58 of the Federal Rules of Civil Procedure provides, in pertinent part that "[e]very judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided for in Rule 79(a)."[3] It is undisputed that the district court did not enter a separate judgment in this action.

■ Rule 58 applies when "there is uncertainty about whether a final judgment has [been] entered." *Clough v. Rush*, 959 F.2d 182, 185 (10th Cir.1992). In this case, there is no question regarding the finality of the district court's order. By granting Burggraf and Anderson's motions for summary judgment regarding each claim asserted by Gross, the district court disposed of the en-

tire action. Therefore, the absence of a Rule 58 judgment does not prohibit our review of this matter. *Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1272 n. 3 (10th Cir.1989).

### 2. *Gross' Title VII Claim*

Gross alleged in her complaint that Burggraf "maintains a working environment that is hostile toward women and that is conducive to the overt harassment and discrimination suffered by [Gross] because of her sex." Gross contends that the following facts support her claim for gender discrimination: 1) Anderson referred to her as a "cunt"; 2) after Anderson was unable to elicit a response from Gross over the CB radio, he made the following statement to another Burggraf employee: "Mark, sometimes, don't you just want to smash a woman in the face?"; 3) on one occasion, as she left her truck, Anderson yelled at her: "What the hell are you doing? Get your ass back in the truck and don't you get out of it until I tell you."; 4) Anderson referred to Gross as "dumb" and used profanity in reference to her; 5) only two women out of the forty who worked under Anderson's supervision completed the 1990 construction season; 6) Anderson hired Gross solely to meet federal requirements against gender discrimination; 7) Anderson disliked women who were not between the ages of 19 and 25 and who weighed more than 115 pounds; 8) Anderson approached Gross after work one day and offered to buy her a case of beer if she would tell another Burggraf employee to "go fuck himself"; 9) Anderson warned Gross that if she ruined the transmission on her truck she would be fired; and 10) Anderson threatened to retaliate against Gross because he had heard that she was contemplating filing an EEOC claim.

■ We must review a grant of summary judgment *de novo*. *Doe v. Bagan*, 41 F.3d 571, 573 (10th Cir.1994). In determining whether Gross presented sufficient *admissi-*

---

**2.** 28 U.S.C. § 1291 provides, in pertinent part that:

 The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States....

**3.** Rule 79 of the Federal Rules of Civil Procedure is entitled "Books and Records Kept by the Clerk and Entries Therein." Rule 79(a) governs civil docket entries.

*ble* evidence to demonstrate that there is a genuine issue of material fact in dispute, we must view the evidence in the light most favorable to Gross. *Conaway v. Smith,* 853 F.2d 789, 792 n. 4 (10th Cir.1988). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

▆ Under Rule 56(c), the moving party has the initial responsibility to show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If this requirement is met by the moving party, the burden shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. The nonmoving party may not rest upon "the mere allegations or denials of [his or her] pleading]...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). He or she must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

### A. *Hostile Work Environment*

▆ In *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court stated that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (citation omitted). The existence of sexual harassment must be determined "in light of 'the record as a whole' and [courts must examine] 'the totality of [the] circumstances,

such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Id.* at 69, 106 S.Ct. at 2406 (citation omitted). The mere utterance of a statement which "'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id.* at 67, 106 S.Ct. at 2405 (citations omitted).

In *Harris v. Forklift Sys., Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Court clarified the elements of a claim for gender discrimination resulting from a hostile work environment:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.* at ——, 114 S.Ct. at 370.

▆ Any harassment of an employee "that would not occur but for the sex of the employee ... may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII." *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987) [hereinafter *Hicks I* ] (citations omitted), *aff'd after remand,* 928 F.2d 966, 971 (10th Cir.1991) [hereinafter *Hicks II* ]. "If the nature of an employee's environment, however unpleasant, is *not due to her gender,* she has *not* been the victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir.1994) (emphasis added).

#### i. *The work environment*

▆ In determining whether Gross has established a viable Title VII claim, we must first examine her work environment. In the real world of construction work, profanity and vulgarity are not perceived as hostile or abusive. Indelicate forms of expression are accepted or endured as normal human behavior. As is clear from Gross' deposition testi-

mony, she contributed to the use of crude language on the job site:

Q. As a construction worker, you had occasion to use profane or obscene language, didn't you?

A. [Gross] Yes.

Q. Can you describe for me or give me examples of the type of language that you would use?

A. Only to say that it was no different than the language that anyone else around me was using.

Q. So you basically could profane equally with the men who were on the job.

A. That's a difficult comparison. I wasn't in competition with anybody.

Q. And I understand that and I'm not calling it competition. I'm just indicating, you say that you used the same language that other people on the job—I guess I'm saying that when you say other people on the job, you're talking about the male construction workers in addition to the female construction workers, right?

A. Yes.

Q. You didn't have any reluctance on the construction job to use profanity, did you?

A. No.

Q. *You were not offended by the use of profanity on the construction site, were you?*

A. *No.*

Q. Did you in fact tell off-color jokes at the construction site?

A. I can't recall specific [sic], but I told jokes similar to the same jokes that I was hearing.

Q. And I understand you can't remember the same jokes. I can't remember the jokes I told last week, Patty. So I don't expect you to remember the specific jokes, but you don't—you know that you would have told off-color jokes like they were telling on the construction site.

A. Yes.

Q. And probably if you heard one at the end of the construction site, when you got [sic] the other end, you would tell it down there because that's—I mean, that's just part of the society on a construction job, isn't it?

A. Yes.

(emphasis added).

Clint Guthrie, another Burggraf employee who worked with Gross during the 1990 season on the Jenny Lake Project, testified that Gross used profanity in the workplace:

Q. .... Did Patty Gross use profanity on the job site?

A. Yes.

Q. Did she use profanity as much as George Anderson did or more or less?

A. Everybody was pretty equal on that aspect.

 Accordingly, we must evaluate Gross' claim of gender discrimination in the context of a blue collar environment where crude language is commonly used by male and female employees. Speech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments. We agree with the following comment by the district court in *Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419 (E.D.Mich.1984), *aff'd*, 805 F.2d 611 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987):

[T]he standard for determining sex[ual] harassment would be different depending upon the work environment. Indeed, it cannot seriously be disputed that in some work environments, humor and language are rough hewn and vulgar. Sexual jokes, sexual conversations and girlie magazines may abound. Title VII was not meant to—or can—change this. It must never be forgotten that Title VII is the federal court mainstay in the struggle for equal employment opportunity for the female workers of America. But it is quite different to claim that Title VII was designed to bring about a magical transformation in the social mores of American workers.

*Id.* at 430.

 Gross contends that Title VII claims should never be decided on motions for summary judgment. To support her position, Gross cites *Ramsey v. City and County of*

*Denver,* 907 F.2d 1004 (10th Cir.1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 302, 121 L.Ed.2d 225 (1992); *Ebert v. Lamar Truck Plaza,* 878 F.2d 338 (10th Cir.1989); *Hicks I* and *Hicks II.* Gross' reliance on these cases is misplaced. None of these cases involves an appeal from an order granting summary judgment, nor do they state that a hostile work environment claim cannot be resolved on such a motion. Furthermore, under the law of this circuit, Title VII claims can be resolved in a summary judgment proceeding if there are no genuine issues of material fact remaining for trial. *Bolden v. PRC Inc.,* 43 F.3d 545, 552 (10th Cir.1994).

### ii. *The controlling test for gender discrimination*

This court's recent decision in *Bolden,* 43 F.3d 545, provides the analytical framework to determine whether Gross has presented sufficient evidence to demonstrate that there is a genuine issue of material fact in dispute. Bolden, an African–American, who worked at PRC as an electrician, brought an action against his employer for racial discrimination based upon a hostile work environment. *Id.* at 548. One of Bolden's co-workers told him "you better be careful because we know people in [the] Ku Klux Klan." *Id.* at 549. The co-worker also used the term "nigger" in his presence, and drew a sad faced cartoon with a caption that stated: "Junior makes the same pay as I do." *Id.* Other persons referred to him in extremely vulgar and offensive scatological terms that were not racist. *Id.*

In affirming the order granting summary judgment in favor of PRC, this court stated that to withstand such a motion, Bolden had to establish that based upon the totality of the circumstances: "(1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Id.* at 551 (citation omitted). Further, this court stated that Bolden had to show " 'more than a few isolated incidents of racial enmity' " and that "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id.* (citations omitted).

The record in *Bolden* showed that the appellant had been employed at PRC for eight years and that he was subjected to blatant racial harassment on only a few occasions. *Id.* This court held that summary judgment had been properly granted to the defendants "[b]ecause the racial comments were not pervasive, [therefore,] they [were] insufficient to be actionable." *Id.* In accordance with *Bolden,* we must determine whether the admissible evidence, presented by Gross in opposition to the motions for summary judgment, demonstrates that the alleged conduct was: 1) pervasive or severe enough to alter the terms, conditions or privilege of employment; and 2) whether the admissible evidence demonstrates that the words used were gender based or stemmed from sexual animus.

#### a. *Alleged inflammatory sexual epithets*

 It is beyond dispute that evidence that a woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII based on the theory of hostile work environment. *Burns v. McGregor Elect. Indus. Inc.,* 989 F.2d 959, 965 (8th Cir.1993).

In opposition to the motions for a summary judgment, Gross presented evidence that Anderson referred to her as a "cunt" outside of her presence. Burggraf moved to strike this evidence as inadmissible hearsay. The district court denied the motion.

Gross alleged in response to an interrogatory that "Ed Durfee told me that he and Don, the night auditor, were standing by [Anderson's] truck as I was walking away from signing out and [Anderson] said to Ed and Dan· 'I hate that fucking cunt.' " The record does not contain Mr. Durfee's testimony regarding Anderson's alleged extrajudicial declaration.

Gross also submitted Clint Guthrie's deposition testimony to support her contention that Anderson called her a "cunt." Guthrie testified as follows:

Q. [Counsel for Gross] Did you ever hear George Anderson refer to Patty Gross in a negative way?

A. [Guthrie] Can you explain that to me?

Q. Did George Anderson ever make derogatory remarks about Patty Gross to you or to anyone else that you overheard?

A. Yes.

Q. Tell me about that.

A. He would—when he was upset, he would refer to her as being dumb or use profane language.

Q. What profane language did he use?

A. Oh, now you put me on the spot to—

MR. CARMAN [Counsel for Burggraf]: I would object unless the question is clear that it's asking for his actual recollections, not speculation, what he can actually recall.

A. Yeah, because I—

Q. (BY MS. VILLEMEZ [Counsel for Gross]) I understand—

A. I can't sit here and say he called her vulgar names or just called her—just used profanity, stuff like that, because he done [sic] it to me, he done [sic] it to Jim Burrows in these situations that he was handling. I mean, he's a guy that's setting [sic] there handling a three-and-a-half-million-dollar job and you've got to get the job done and your profit margin it depends on—your employee job performances depends on how much money the company makes.

Q. You said that he referred to Patty Gross as dumb and that he used profane language sometimes when he talked about her, right? *Can you recall anything else, any other negative or—*

A. *It's only hearsay.*

Q. —degrading remarks? Okay. The ones that you have been telling me about, are those remarks that you actually heard?

A. Yeah, pretty much, yes.

Q. *And then you also heard some hearsay remarks?*

A. *Yes.*

Q. Tell me about those—

A. Well I—

Q. —*who told you and what they were, what the remarks were.*

A. *I don't even remember who it was that told me.* It was over that radio conversation or something where somebody said something about Patty and it had to do with not spraying a truck or something like that. And at that time, I didn't have that radio or anything like that, so I didn't actually directly hear the remark. *And I don't even know who said the remark. I hear it's this guy and then this guy is taking the blame for it and it's this guy.* And that's what I'm talking about hearsay.

Q. Okay. So that's—

A. So I can't really even discuss that remark because I don't know. This involves me directly. So I can't—

Q. Right.

A. I can't speculate on who is who and where is where.

Q. And I realize you can't remember who said it or what it—do you remember what the remark was?

A. Something about spraying a truck and something said about—something about the dumb cunt or something like that or—it was something to that aspect [sic] as what was said. *But I don't know who said it* or on what radio or who was talking to who [sic] or anything like that. I remember somewhat the phrase, but I don't know who was talking to who [sic]. *I can't directly say that that was George [Anderson] talking to one of the truck drivers or one of the truck drivers talking to Patty. Like I say, it was hearsay on my part.*

Q. Do you understand that the remark did refer to Patty Gross?

A. Yes.

Q. Can you tell me any other hearsay remarks that you heard.

A. I really didn't pay any attention to it other than this particular aspect, this particular remark, because this one kind of—I mean, it was kind of a thing that went from one end of the job to the other and then back and stuff. So I don't really recall any other—this one sticks out in my mind.

Q. Why does this one stick out in your mind?

A. Because it was like a bunch of bees. I mean, it was buzzing and everybody was talking about it and going—whispering to one another. You know, somebody said this to this one and this one said this to this one, and you know, I looked at it as a bunch of gossip.

Q. Do you know if anyone talked to Patty Gross about this dumb cunt remark?

A. No.

. . . .

Q. *Did you ever directly hear George Anderson call Patty a dumb cunt?*

A. *Not that I recall, no.*

(emphasis added).

 It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment. *Thomas v. IBM,* 48 F.3d 478, 485 (10th Cir.1995); *World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). Hearsay testimony cannot be considered because "[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill." *Thomas,* 48 F.3d at 485 (citations omitted). Answers to interrogatories must meet the requirement of Rule 56(e) that evidence offered in opposition to a motion for summary judgment must be " 'made on personal knowledge ... set forth such facts as would be *admissible in evidence,* and ... show affirmatively that the [person who responded to the interrogatories] is competent to testify to the matters' set forth therein." *H.B. Zachry Co. v. O'Brien,* 378 F.2d 423, 425 (10th Cir.1967) (citation omitted); *accord, Garside v. Osco Drug, Inc.,* 895 F.2d 46, 49 (1st Cir.1990) (answers to interrogatories should be accorded no probative force if they are not based upon personal knowledge or are otherwise deficient).

 Gross' response to the interrogatory regarding what Ed Durfee allegedly heard was not based on her personal knowledge of the facts. It was double hearsay. Double hearsay is admissible only "if each part of the combined statements conforms with an exception to the hearsay rule...." Fed.R.Evid. 805; *Boren v. Sable,* 887 F.2d 1032, 1035 (10th Cir.1989). Gross has not argued that there is an applicable exception to the hearsay rule that would make Durfee's alleged statement to Gross admissible at trial. Our research has not disclosed any support for such a ruling. Therefore, Durfee's statement cannot be considered in reviewing the order granting the motions for summary judgment. *Thomas,* 48 F.3d at 485; *World of Sleep, Inc.,* 756 F.2d at 1474. Guthrie's deposition testimony was likewise inadmissible to demonstrate that there was a genuine issue of material fact in dispute. Guthrie did not hear Anderson call Gross a "cunt." Instead, he informed counsel that he did not know the identity of the person who told him that Anderson had made that offensive remark. Guthrie correctly characterized the alleged statement as "hearsay" to counsel during the deposition proceedings.

Gross asserts that the evidence that Anderson referred to her as a "cunt" is admissible as an admission by a party opponent. Gross does not present any argument in her brief that supports this theory of admissibility. Instead, without analysis, Gross simply referred this court to Rule 801(d)(2)(A) of the Federal Rules of Evidence,[4] *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), and *United States v. Pinalto,* 771 F.2d 457 (10th Cir.1985). Gross' reliance on this authority lacks merit.

 Rule 801(d)(2)(A) merely indicates that the a party's own admission is not hearsay. It does not eliminate the requirement of Rule 602 of the Federal Rules of Evidence that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has per-

---

**4.** Fed.R.Evid. 801(d)(2)(A) provides, in pertinent part that:

A statement is not hearsay if—

**(2) Admission by party opponent**

The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity....

sonal knowledge of the matter...." Fed. R.Evid. 602. Neither Gross nor Durfee had personal knowledge that Anderson used a sexual epithet in reference to Gross.

In *Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242, the Supreme Court held that the district court had erred, as a matter of law, in excluding the admission of a party as inadmissible hearsay. *Id.* at 172, 94 S.Ct. at 993. The Court concluded that the district court's ruling violated Rule 801(d)(2)(A). *Id.*

In *Pinalto*, 771 F.2d 457, this court held that it was error to exclude tape recorded conversations between a defendant and a confidential informant on the ground that the informant was not credible. *Id.* at 459. This court ruled in *Pinalto* that the district court "invaded the province of the jury when it suppressed the Pinalto tapes because it found them unreliable." *Id.*

In this matter, Gross' responses to an interrogatory, and Guthrie's deposition testimony, were inadmissible because this evidence failed to meet the trustworthiness requirement for exceptions to the law against the admission of extrajudicial statements. *See e.g., United States v. Gary*, 999 F.2d 474, 479 (10th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 259, 126 L.Ed.2d 211 (1993) (citations omitted) (" 'Generally [hearsay evidence] is not admissible ... because traditional conditions of admissibility, including that the witness be present at the trial, testify under oath, and be subject to cross-examination, all of which together permit a jury to evaluate the reliability and trustworthiness of a statement, are not present.' ").

■ An admission by a party to an action is admissible in evidence only if a witness, who heard the party make the statement, is presented for cross-examination. *See*

*N.L.R.B. v. Process & Pollution Control Co.*, 588 F.2d 786, 791 n. 2 (10th Cir.1978) (witness' testimony, regarding what a party to an action stated, was inadmissible because the witness was unavailable for cross-examination). Gross failed to present percipient witnesses to testify regarding the statements which she attributes to Anderson. The record does not contain admissible evidence that Anderson used the word "cunt" in referring to Gross.

#### b. *Hostile words*

Gross presented admissible evidence that on one occasion, after Anderson attempted to locate Gross over the CB radio, he radioed Mark Mikeswell, another Burggraf employee, to determine whether he knew of Gross' whereabouts. Mikeswell responded that he did not. Anderson then stated over the CB, "Mark, sometimes don't you just want to smash a woman in the face."[5] It is undisputed that when Anderson made this statement, he was unaware that Gross was able to hear him.

There is no evidence in the record that Anderson ever threatened Gross with violence, or ever attempted to harm her physically. Gross testified during her deposition that once she and Anderson were able to communicate with each other, Anderson told her that his inability to reach her was probably the result of a problem with his radio.

■ Anderson's statement clearly reflects a supervisor's frustration at being unable to locate a female employee. It is not sufficient to demonstrate a hostile work environment. The Supreme Court has instructed that a single statement which " 'engenders offensive feelings in an employee' would not affect the conditions of employment to [a]

---

**5.** In Gross' responses to interrogatories, she initially stated that Anderson said "Mark, sometimes, don't you just want to smash her in the face." During Gross' deposition, when she was questioned about what Anderson actually said, she responded as follows:

> Q. [Counsel for Burggraf] Okay. Now, in your answer to interrogatories, it says, "Mark, sometimes don't you just want to smash her in the face," in quotation marks. Was that your recollection at the time?

> A. [Gross] No. I remember him saying, "Mark, sometimes don't you just really want to smash a woman in the face?" but because it was in [sic] immediate response to him not being able to contact me on the radio, that he made that comment—I felt very much that it was directed at me. I'm the person that he had been calling on the radio. He wasn't calling anybody else out there. There were no other women on the job with radios in their truck [sic]. And so, I felt as though it was directed right at me....

sufficiently significant degree to violate Title VII." *Meritor Sav. Bank, FSB*, 477 U.S. at 67, 106 S.Ct. at 2405 (citations omitted). To demonstrate that she was subject to a hostile work environment, Gross had to present admissible evidence that she was subjected to a "steady barrage of opprobrious [sexual] comments." *Bolden*, 43 F.3d at 551 (citations omitted). This isolated statement does not demonstrate gender discrimination.

### c. *Vulgarity and criticism by a supervisor of a subordinate's work*

Gross maintains that Anderson made several vulgar and "harassing" statements in her presence that demonstrate that she was subjected to a hostile work environment. We discuss each allegation under separate headings.

#### 1. *Anderson's reference to a portion of Gross' body*

■ One afternoon, at 4:00 p.m., Anderson yelled at Gross: "What the hell are you doing? Get your ass back in the truck and don't you get out of it until I tell you." It is undisputed that Gross was aware that compaction and density tests were being performed that afternoon. Further, Gross testified that she knew that some members of the road crew, of both genders, were needed to perform such tests and that Anderson insisted that the employees stay on the site until all of the tests were completed. The term "ass" is a vulgar expression that refers to a portion of the anatomy of persons of both sexes. Thus, the term is gender-neutral. Its usage on a construction site does not demonstrate gender discrimination.

#### 2. *Anderson's use of demeaning terms*

■ Gross maintains that Anderson referred to her as "dumb." Gross did not present any evidence that he characterized her as "dumb" when she was present. The only evidence that Gross presented that Anderson referred to her in this manner, is the portion of Guthrie's deposition quoted *supra*, in the section entitled "Alleged inflammatory sexual epithets." Guthrie's deposition testimony establishes that when Anderson was upset, he called Gross "dumb."

Guthrie's deposition, however, also establishes that Anderson used crude or harsh language in reprimanding each of his employees. The term "dumb" is gender-neutral. Guthrie's testimony does not demonstrate that Anderson subjected Gross to gender discrimination.

#### 3. *The fact that only two women remained on the job for the entire construction season does not demonstrate gender discrimination*

Gross argues that "she was not alone in finding Mr. Anderson's conduct intolerable." She maintains that we can infer that Anderson's treatment of women created a hostile work environment from the fact that only two women, out of the forty who worked under Anderson's supervision completed the 1990 construction season. To support her position Gross cites *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853 (3rd Cir.1990). In *Drinkwater*, the Third Circuit stated that a factor in establishing a hostile work environment is whether the defendant's actions would have "detrimentally affect[ed] a reasonable person of the *same sex* in the position...." *Id.* at 860 (emphasis added).

■ Gross' reliance on *Drinkwater* does not advance her cause. Gross has failed to submit any evidence to support her assertion that the other female employees left the Jenny Lake Project because of Anderson's alleged discriminatory treatment of women. It is undisputed that the work performed by Burggraf employees is seasonal. The only evidence in the record concerning the reason that women left the Jenny Lake Project before the construction season ended is that most of them departed to return to college. No evidence was presented that any of them left early because of a hostile work environment. The mere fact that only two women employees remained on the job at the end of the season does not support an inference that Anderson created a hostile work environment for Gross and the other female employees at the Jenny Lake Project.

#### 4. *Anderson hired Gross to meet federal requirements*

Gross maintains that "Anderson acknowledged that he hired Ms. Gross not because

he wanted to, but in order to meet federal equal opportunity requirements on the Jenny Lake Project...." According to Gross, the fact that Anderson hired her to comply with federal law is evidence that she was subjected to a hostile work environment. Gross submitted the following portion of Anderson's deposition testimony to support this theory:

Q. Would you explain to me what your relationship to Patricia Gross was during [the 1990 construction season]?

A. I was her supervisor.

Q. Had she ever worked for you before?

A. No.

Q. Had she ever worked for Burggraf before?

A. Yes, she had. She had worked for Burggraf, I think, the preceding summer under Richard Neff [sic] as supervisor.

Q. Was that the basis under which you hired her, that she had previous experience with the company?

A. No.

Q. Tell me why you hired her?

A. I hired her—I asked Richard Neff [sic] for some women truck drivers, so we could meet our women minor [sic] for the participation on [the Jenny Lake Project]. I asked Richard for some women that could drive trucks. Tracey, I forget her last name, and Patty.

Q. Did you hire Patty?

A. I contacted Tracey first because that was Richard's recommendation, that Tracey would be his first choice. Patty was second choice. I could not get ahold of Tracey, she had obtained employment elsewhere, so I got ahold of Patty.

■ This evidence establishes that Anderson hired Gross because he was required to do so under federal law. Thus, it demonstrates his compliance with a law that compels the hiring of women. It does not support an inference of gender discrimination. The record shows that Gross worked more hours on the Jenny Lake Project than any other Burggraf truck driver. Furthermore, she received a $1.00 an hour raise during the 1990 season. Gross has failed to establish that there was a nexus between the fact that Anderson hired her to comply with federal law and her belief that she was subjected to a hostile work environment. Hiring a woman for the express purpose of complying with federal law does not demonstrate gender discrimination.

### 5. Anderson's alleged preferences regarding women

In her response to an interrogatory, Gross alleged that Richard Naef told her that "Anderson had a problem with women who were not between the ages of 19 and 25 and who weighed more than 115 pounds." Mr. Naef told Gross that his opinion was based on "complaints from women who worked with Anderson the prior season."

■ Mr. Naef's opinion regarding Anderson's idiosyncratic impressions about female beauty was inadmissible under Rule 701(a) of the Federal Rules of Evidence because it was not based on his personal knowledge of any statement Anderson may have made about his preferences concerning a woman's appearance.[6]

### 6. Anderson's offer to buy Gross a case of beer

■ Anderson approached Gross after work one day, and stated that he had heard that Rick Anderson had "chewed her out." Gross replied "yeah, I fucked up." Anderson stated that he would buy Gross a case of beer if she told Rick to "go fuck himself the next time he chewed her out." Although Anderson's comment is clearly offensive in certain settings, and to many persons, he merely repeated the same vulgar verb that had been previously used by Gross. Anderson's use of this term does not support Gross' contention that she was subjected to discrimination because of her gender. In

---

**6.** Fed.R.Evid. 701 provides, in pertinent part that:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness....

fact, it would appear that Anderson's comment was a crude attempt to express his support for her because she had been reprimanded by Rick Anderson.

### 7. *Anderson embarrassed and humiliated Gross*

Gross alleges that Anderson embarrassed and humiliated her in the presence of other employees when he told her that if she ruined the transmission on the truck she was driving, she would be fired because her truck would be inoperable. It is undisputed that the clutch in Gross' truck required extensive repairs. The parties do not agree, however, on the reason that these repairs were necessary. Gross maintains that there was a problem with the clutch before she began driving the truck. Burggraf and Anderson argue that the clutch was fine when Gross began working on the Jenny Lake Project. They contend that the repairs were required because of the way that Gross was driving the truck out of the "pit." Viewing the evidence in the light most favorable to Gross, we must accept her testimony that she was not responsible for the truck's condition. *Conaway,* 853 F.2d at 792 n. 4.

Anderson informed Gross that she needed to ride with another employee to learn how to drive properly out of the pit. Anderson told Gross that "if you tear the transmission out of the truck, you are going to be fired and you are not going to have a job, there won't be anything for you to do anyway because you've torn the truck up."

To support her position that Anderson's conduct toward her in the presence of other Burggraf employees is sufficient to demonstrate that she was subjected to gender discrimination, Gross cites *Steiner v. Showboat Operating Co.,* 25 F.3d 1459 (9th Cir.1994), *cert. denied,* ___ U.S. ___, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995), and *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900 (11th Cir.1988). The facts presented for review in *Steiner* and *Huddleston* are readily distinguishable from those before us in this matter.

In *Steiner,* 25 F.3d 1459, a female blackjack dealer testified that her supervisor referred to her in her presence as a "dumb fucking broad," a "cunt," and a "fucking cunt." *Id.* at 1461. Additionally, the record showed that he yelled profanities at her in front of customers and other casino employees while moving toward her in a threatening manner. *Id.* In reversing an order granting summary judgment, the Ninth Circuit held that while the evidence established that the supervisor was "abusive to men and women alike; ... his abusive treatment and remarks to women were of a sexual or gender-specific nature." *Id.* at 1462. In this action, Gross has failed to submit any admissible evidence that Anderson used a gender based vulgarity in reference to her or that he engaged in any physically threatening conduct. Instead, the admissible evidence in the record demonstrates that Anderson criticized her in the presence of others because of his belief that she had abused company equipment. She has not presented any evidence that his criticism of her driving was sexual or gender specific.

In *Huddleston,* 845 F.2d 900, the evidence showed that a supervisor yelled at Huddleston virtually every day in front of her co-workers. *Id.* at 903. On one occasion, her supervisor "grabbed her by the arm and forcibly moved her a few feet." *Id.* She was called a "bitch" and a "whore" to her face and in front of her customers. *Id.* at 902. Her appearance was frequently ridiculed, and she was told " '[w]e're going to take your pants off and put a skirt on you,' and 'we're going to take your clothes off to see if you are real.' " *Id.* The Eleventh Circuit concluded that this evidence was sufficient to demonstrate gender discrimination. *Id.* at 904–05.

■ Unlike the circumstances in *Huddleston,* Gross failed to present admissible evidence that Anderson used a vulgar term in referring to her, assaulted her, or threatened her with physical violence. Gross has failed to demonstrate that Anderson's reprimand was motivated by gender discrimination. An employee's supervisor has the right to express concern about misuse of company equipment. Gross clearly is entitled to equal treatment under Title VII. Title VII, however, does not give a woman immunity from

being reprimanded in the presence of her co-workers if her supervisor believes that she has violated work rules or has been negligent in performing her job.

### 8. *Anderson's alleged threat to retaliate*

The record shows that after Anderson heard rumors that Gross intended to file a complaint with the EEOC, he ordered her to get into his pickup truck. Gross testified in her deposition that Anderson "grilled" her about "her problem" and her plan to bring discrimination charges against him. While they were in the truck, Anderson provided Gross with a copy of a "supervisor's handbook" and showed her the requirements for filing an EEOC claim.

According to Gross, Anderson also told her that she was "skating on thin ice" and that if anyone "were leaving the company, she would be the one because of her 'bad attitude.'" In addition, Anderson stated that he could talk to her any way he wanted, regardless of whether it embarrassed or humiliated her in front of her co-workers. During this confrontation, Anderson informed Gross that she was supposed to address him as "sir" over the company radio. Gross argues that Anderson's statements can be construed as a threat to retaliate against her if she exercised her equal employment rights.

Gross did not file an EEOC complaint during the 1990 construction season. Further, Gross did not present any evidence that Anderson attempted to terminate her employment prior to the end of the construction season. To the contrary, the record shows that Gross worked more hours on the Jenny Lake Project than any other truck driver and that she received a pay raise. She was not laid off until the paving was completed and after there was no further need for a water truck driver on the Jenny Lake Project.

▮ Anderson's reference to "her problem," his statement that she was "skating on thin ice," and his insistence that she call him "sir," do not demonstrate a hostile work environment for women. None of these statements is sexual or gender based.

---

7. 42 U.S.C. § 2000e–3 provides, in pertinent part that:

### iv. *Unsupported allegations of gender discrimination*

The following factual allegations of alleged gender based conduct are contained in Gross' brief on appeal, without any citation to the record: a) she was subjected to a hostile work environment because she was a "woman working at a 'man's job'"; b) Anderson made sure Gross was one of the first employees let go from the Jenny Lake Project; c) Anderson repeatedly threatened to fire her for the slightest transgression; d) Anderson accused her of lying and of attempting to steal from Burggraf; e) Anderson deliberately misled her regarding her working hours and forced her to remain on the job when she had no duties to perform; and f) Anderson called her "stupid" and screamed at her without reason.

▮ To withstand a motion for summary judgment, "the nonmovant must do more than refer to allegations of counsel contained in a brief...." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "[S]ufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Id.* at 1024 (citations omitted). Without a specific reference, "we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Id.* at 1025; *accord, United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). We cannot consider these unsubstantiated allegations in reviewing this appeal.

### B. *Retaliation*

The first cause of action in Gross' complaint lumps together two theories of liability under Title VII: gender discrimination in the form of a hostile work environment *and* retaliation because of an employee's opposition to discriminatory conduct.[7]

(a) It shall be an unlawful employment practice for an employer to discriminate against

Gross' brief contains one paragraph in which she refers to retaliation:

> Mr. Anderson also threatened to discharge Ms. Gross after hearing rumors that she might file an Equal Employment Opportunity Commission complaint based on her allegations of gender discrimination. Retaliation sparked by an employee's attempt to enforce her equal employment opportunity rights are prohibited by 42 U.S.C. 2000e–3(a). Such retaliation is an additional incident of unlawful discrimination based on gender.

Gross did not submit any argument, cite relevant case law, or alert us to any part of the record that demonstrates retaliatory conduct. Rule 38 of the Federal Rules of Appellate Procedure provides, in pertinent part that:

> (a) .... The brief of the appellant must contain, under appropriate headings ...:
>
> (6) An argument. The argument must contain the contentions of the appellant on the issues presented and the reasons therefor, *with citations to the authorities, statutes and parts of the record relied on.*

(emphasis added).

▮▮▮▮ This court has stated that " '[i]t is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for appeal.' " *Johnson by Johnson v. Thompson,* 971 F.2d 1487, 1499 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993) (citations omitted); *see also Jordan v. Bowen,* 808 F.2d 733, 736 (10th Cir.), *cert. denied,* 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987) ("Appellants who fail to argue [an] issue in their brief are deemed to have waived [that] contention on appeal."). Although Gross maintained in oral argument that she was asserting a claim of retaliation under Title VII, she has not adequately briefed this issue on appeal. Therefore, we decline to consider the merits of Gross' claim of retaliation.

> any of his employees ... because he has opposed any practice made an unlawful employ-

## CONCLUSION

After reviewing the admissible evidence in the record, we conclude that Gross has failed to demonstrate that there is a genuine issue of material fact in dispute that she was subjected to a hostile work environment because of her gender. None of the alleged instances cited by Gross to support her Title VII claim is sufficient on its own to establish that she was discriminated against because of her gender. We have examined the evidence as a whole to determine whether the totality of the circumstances supports a viable Title VII claim. *Bolden,* 43 F.3d at 551.

The evidence offered by Gross concerning the use of the word "cunt" was improperly considered by the district court in determining whether the motions for summary judgment should have been granted. This evidence was inadmissible because Gross failed to offer a percipient witness' testimony regarding Anderson's alleged admissions. The record does reveal an isolated instance of gender based conduct. Anderson's statement to Mark Mikeswell, "Mark, sometimes don't you just want to smash a woman in the face?" reflects hostility toward women. The Supreme Court has instructed however, that a single statement which " 'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Meritor Sav. Bank, FSB,* 477 U.S. at 67, 106 S.Ct. at 2405 (citations omitted).

The remaining evidence that Gross presented in support of her claim of gender discrimination reflects crude and rough comments used by a construction boss in reprimanding or motivating his employees regarding their job performance. None were related to Gross' gender. Therefore, after considering the totality of the circumstances, we hold that Gross has failed to establish that there is a genuine issue of material fact to establish gender based harassment that was pervasive and severe enough to alter the terms, conditions or privileges of employment. *Bolden,* 43 F.3d at 551.

> ment practice by this subchapter....

Because we affirm the order granting the motions for summary judgment, we do not reach the issue presented in the cross-appeal concerning whether the district court erred in denying Burggraf's motion to strike materials submitted by Gross in opposition to its motion for summary judgment.

AFFIRMED.